1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| RICHARD MONTEMARANO, individually and on behalf of all others similarly situated,<br><br>             Plaintiff,<br><br>     v.<br><br>IMPINJ, INC., CHRIS DIORIO, EVAN FEIN and ERIC BRODERSEN,<br><br>             Defendants. | No. 2:18-cv-01264<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><u>DEMAND FOR JURY TRIAL</u> |



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Impinj, Inc. ("Impinj" or the "Company"), Company press releases and conference call transcripts, as well as media and analyst reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the publicly traded securities of Impinj between May 4, 2017, and August 2, 2018, inclusive (the "Class Period"), alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

3.      Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b).  The acts and transactions giving rise to the violations of law complained of occurred and Impinj's headquarters are located in this District.

## PARTIES

4.      Plaintiff Richard Montemarano purchased Impinj securities during the Class Period, as described in the Certification attached hereto and incorporated herein by reference, and was damaged thereby.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1     5.     Defendant Impinj is a Delaware corporation with its principal executive offices
2   located in Seattle, Washington.  Impinj is traded on the NASDAQ under the ticker symbol "PI."

3     6.     Defendant Chris Diorio ("Diorio") is, and was at all relevant times, the Vice
4   Chairman and Chief Executive Officer of Impinj and a member of the Board of Directors.

5     7.     Defendant Evan Fein ("Fein") was, until he resigned effective March 30, 2018, the
6   Chief Financial Officer ("CFO") of Impinj.

7     8.     Defendant Eric Brodersen ("Brodersen") is, and was at all relevant times, the
8   President and Chief Operating Officer of Impinj.  Since defendant Fein's departure, defendant
9   Brodersen has also been serving as the Principal Financial Officer of Impinj.

10    9.     Defendants Diorio, Fein, and Brodersen are referred to herein as the "Individual
11  Defendants."

12    10.    During the Class Period, the Individual Defendants served as Impinj's executive
13  management and oversaw the Company's operations and finances.  The Individual Defendants
14  were intimately knowledgeable about all aspects of Impinj's financial and business operations.
15  They were also intimately involved in deciding which disclosures would be made by Impinj.  The
16  Individual Defendants made various public statements for Impinj during the Class Period, and
17  participated in Class Period analyst conferences.

18                                **INTRODUCTION**

19    11.    Impinj sells integrated circuit ("IC") tags ("tag ICs"), which, when connected to an
20  item, are called endpoints.  These endpoints function as a tag system that provides wireless
21  information about tagged items, including information about the item's identity, location, and
22  authenticity.  Impinj's platform connects items such as apparel, medical supplies, automobile parts,
23  driver's licenses, food, and luggage to applications such as inventory management, patient safety,
24  asset tracking, and item authentication, delivering real-time information to businesses about items
25  they create, manage, transport, and sell.

26

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

12.     Impinj also sells reader ICs that enable wireless communication with the tag ICs. Original equipment manufacturing customers typically place large orders for reader ICs for use in their products and often secure supply for an extended period of time.  Impinj also sells gateway systems that allow tag ICs to be scanned while in motion, such as when the item passes through a hallway, and employs software to manage the information and process.

13.     During the Class Period, defendants claimed to be experiencing robust demand for their endpoint ICs, permitting them to report outsized sales.  The strong sales and revenues being reported, however, were not sustainable because they were the result of inlay customer orders running ahead of actual consumption due to longer production lead times than normal (nearly twice as long), and did not support defendants' claims that the strong sales were indicative of increasing adoption.  When supply constraints eased in mid- to late 2017, customers adjusted their ordering practices and the backlog dropped to match the shortened lead times.  As a result, customers had accumulated approximately half a billion excess endpoint ICs in inventory that would depress the Company's sales during 2018.

**FALSE AND MISLEADING CLASS PERIOD STATEMENTS**

14.     The Class Period begins on May 4, 2017.  On May 4, 2017, Impinj issued a press release reporting its financial results for the first quarter of 2017 ("1Q17"), ended March 31, 2017. Revenue for the quarter grew 47% year over year to $31.7 million.  Defendants also issued guidance for Impinj's second quarter 2017 ("2Q17") results, stating that revenues were expected to be in the range of $32.4 million to $33.9 million.

15.     Defendants also conducted a conference call with investors and stock analysts on May 4, 2017, to discuss Impinj's business metrics and financial prospects.  In his prepared remarks, defendant Diorio stated in pertinent part as follows:

> We delivered a strong first quarter, with revenue growing 47% year over year to $31.7 million, just above the top end of our guidance.  All layers of our platform delivered solid results. Importantly, the momentum we see in our business today is strong.

*       *       *



My view of the RAIN market today is strong growth with enormous potential.  Starting with that strong growth, ***recall on our last earnings call we guided our 2017 Endpoint IC volumes to be between 7.8 billion and 8 billion units, 32% growth over 2016 at the midpoint***.  Roughly equivalent to one IC for every person on the planet.

***That prior guidance, which represents growth of nearly 2 billion units over 2016, remains unchanged***.

16.     Defendant Fein reiterated Impinj's purportedly ongoing strong financial performance in his prepared remarks, representing that Impinj was increasing inventory levels in order to meet strong demand, stating in pertinent part as follows:

***Consistent with our plan, we continued increasing inventory levels to meet market demands, reduce lead times, and support our growth***.  We increased inventory by $11.5 million over the prior quarter, bringing the balance to $39.2 million.

                    *        *        *

***[W]e are maintaining our 2017 Endpoint IC volume estimate between 7.8 billion and 8.0 billion units, representing 32% growth over 2016 at the midpoint and a 2010 to 2017 volume CAGR of 36%***.

17.     Brad Erickson, an analyst from Pacific Crest Securities, pressed defendants about inventory and visibility in the following exchange on the May 4, 2017 conference call, with defendants assuring him that the strong sales were supported by strong product adoption, stating in pertinent part as follows:

[Erickson:]  Got it.  And then there's obviously been a lot of reports of retail store closures here recently.  Evan, you made some nice comments earlier on the balance sheet and how you're thinking about inventory levels.

***How do you feel about inventory, and specifically your visibility of inventory, with your inlay providers?***  And maybe just talk about where you stand today on that?

                    *        *        *

[Fein:]   Yes. Hi, Brad. So as you know, ***we have an array of Endpoint IC customers that we keep in regular contact with. We***



*have relationships at all levels of those customers, meaning both executive and kind of in the line and managerial level.  And based on those checks, we feel very good about the inventory levels at those places.*

18.     Mitch Steves, an analyst with RBC Capital Markets, also engaged defendant Fein on the growing inventory numbers, with Fein reassuring him too that the growing inventory was required to fulfill the strong demand, stating in pertinent part as follows:

[Steves:]  So I just had two quick ones from me.  So first, ***on the inventory side, it looks like that's building pretty rapidly here***.  It looks like you're at $39 million for March, but then you are talking about potentially this being one of the best setups you've seen in years.  ***So is this just essentially a backlog of demand building or why is the inventory up another $12 million or so?***

. . . [Fein:]  ***2016 was a year where we were not able to adequately meet customer demand because our inventory position was too low***.

***And we are in the process of correcting for that so that we can have an inventory position that meets demands of our market, the timing needs of our customer***, and so forth.  And we're not quite there yet.  The $39.2 million is a step in that direction.

But as I said, ***the momentum and the demands are so great, we're going to invest even more in inventory in the second quarter***.  And then that growth in inventory will slow a bit on an absolute basis that will continue to rise.  But the expansion will moderate.

19.     The price of Impinj stock rose more than 8% following the May 4, 2017 earnings announcement and conference call.

20.     On August 3, 2017, Impinj issued a press release announcing its 2Q17 financial results.  Impinj reported revenue of $34.1 million, representing 31% year-over-year growth. Defendants issued guidance for Impinj's third quarter 2017 ("3Q17") results, with revenue expected to be in the range of $31.75 million to $33.25 million.

21.     The August 3, 2017 press release included the following quote from defendant Diorio:

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264

- 5 -



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1
2
3

[A]s we enter the third quarter we *see schedule slips in planned rollout expansions at several large end customers, and consequently, we are revising our 2017 full-year endpoint IC estimate* to be between 7.0 billion to 7.2 billion units.

4      22.      Defendants also conducted a conference call with investors and stock analysts on

5   August 3, 2017, in which they discussed their reduced sales expectations for the rest of the year,

6   claiming they were due to internal issues with customers rather than a lack of demand for the

7   product.  Specifically, defendant Diorio in his prepared remarks stated in pertinent part as follows:

8
9
10
11
12
13

In 2016, we benefited from several large end customer rollouts that helped drive our endpoint IC volumes up approximately 70% over 2015.  *As we enter the third quarter, we see a different situation with several large end customers delayed planned expansions*.  I visited 2 of these customers overseas in the last 30 days.  According to them, their deployment plans and goals remain unchanged, but their *rollouts are delayed by internal schedule slips.  Consequently, we are reducing our full year 2017 endpoint IC guidance* from between 7.8 and 8.0 billion units to between 7.0 and 7.2 billion units representing 18% growth over 2016 at the midpoint.

14      23.      In response to questions from analyst Craig Hettenbach, defendant Diorio assured

15   him the reduced sales expectations were due to "internal" customer issues and not to a "macro"

16   decline in demand, stating in pertinent part as follows:

17
18

[Hettenbach:]  Any sense in terms of how long they view the delay?  Is there some digestion period?  Any visibility into when they would kind of ramp back up?

19
20
21
22
23
24
25
26

[Diorio:]  Craig I think I'm just going to say a little bit about kind of those delays, maybe a little bit more right now, and then we'll touch on their ramp period as they ramp back up.  So despite seeing significant wins in the second quarter in retail logistics and healthcare, in this coming third quarter, *we're seeing coincident schedule slips in a few planned and funded end customer deployments.  Our direct discussions with these end customers indicate the delays are due primarily . . . to internal process and integration challenges at their end.  We don't see evidence that macro trends are common themes* other than our difficulty predicting the timing of large rollouts, which we have talked about previously. So we see 2 impacts to our business. First, our endpoint [IC] business is impacted by scheduled foot slips at a few retail end customers.  And then second, our fixed infrastructure business is

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

> impacted by scheduled slips in a few non-retail deployments. And the length of slips really varies by the end customer, and so it's difficult to predict how quickly they're going to overcome this integration challenges. Really, as we've noted before, timing whales is just difficult.

24. In responding to a question on the conference call from analyst Mitch Steves, defendant Brodersen reinforced the other defendants' statements that the decline was due to customers' internal issues, stating in pertinent part as follows:

> [Steves:] So I think the biggest highlight here, and what people are trying to figure out is, you mentioned that you landed already whales and the contracts are signed. So if that's the case, does that mean we're going to see kind of material growth when we start out 2018? Or how does kind of the sequential trend work out given that the timing is very difficult for you guys to figure out?
>
> . . . [Brodersen:] [T]here's a couple of pieces here to your question. You're sort of probing on timing and the pace at which some of these programs come back online, correct? ***So I think as Chris highlighted it, the length of these schedule slips really is dependent on the customer. But I think, we're comfortable saying that it's generally measured in quarters***. And so that's the way I think I would best describe the way that you think about modeling or the way that you think about when the business comes back online.

25. Defendant Diorio also assured analyst Jim Ricchiuti on the conference call that there was no adverse macro trend occurring, claiming it was merely a coincidence of multiple schedule slips at the same time, stating in pertinent part as follows:

> [Ricchiuti:] [I]t sounds like one or more of these may be existing customers that was in the process of expanding a deployment? Or maybe, are these entirely new customers?
>
> [Diorio:] You are correct. Some are customers that were expanding existing deployment. Some of them, kind of visionary customers that were having expansions and they've just gone a little slower for internal reasons. And some may be new customers that had already planned deployments and they had schedules, and for internal reasons, again, they had schedule slips. And I think what we're just seeing here is that – the word I used previously was there's some coincident schedule slips. ***We don't see any macro trend in those – in the coincident nature of those schedule slips. It just happens***

HAGENS BERMAN
1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

***to be that a couple of them happened at the same time.  And as a consequence, we reduced our endpoint IC guidance.***

26.    Defendant Diorio responded to further questioning by Brad Erickson regarding these supposedly coincidental customer schedule slips by assuring him that defendants had good visibility into the demand of the Company's customers, stating in pertinent part as follows:

> [Erickson:]  Just curious on the schedule slips you called out.  It sounded like you were having direct discussion with the retailers. Did you get any indications from – or I guess, were these going through any of your direct partners, like the inlay partners that you typically work with[, with] your retail customers?  Or was there reason you got more directly involved with these particular end users or end customers?
>
> . . . [Diorio:]  First, the slips are not all isolated to the retail vertical. And so I noted, probably before you joined the call, that there's impacts on the retail side, as well as fixed infrastructure business in other verticals.  So it's not all confined to retail, which is against the point that we don't see a macro trend.  And then for us, we really use the best techniques available to us to get information, as well as to drive our business forward.  So we engage closely with our partners and we also engage directly with the end customers helping our partners drive business into those end customers.  And ***our engagements with those end customers not only allows us to really time the deployments and understand what the market's doing, but also gives us information on the nature of these slips and helps us drive business***.  So we remain confident in our long-term outlook vision as a consequence, and it's just the nature of how we're engaging in the market today that gives us this visibility to these slips, which again, for a customer that's a whale, they can pull in or push out kind of at their whim.  And I guess, I don't want to use quite that word, but they do it based on what their internal schedules drive.  And as I noted in my comments, a pull in or push out could actually mean several hundred million IC units to us.

27.    On this news, Impinj stock dropped more than $10 per share, or 21%, to close at $37.52 per share on August 4, 2017, on unusually high trading volume of more than 4.86 million shares traded.  However, Impinj's stock continued to trade at artificially inflated prices because defendants continued to conceal and misrepresent material facts regarding Impinj's business metrics, operations, and financial prospects.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1    28.     On November 1, 2017, Impinj issued a press release announcing its 3Q17 financial

2    results.   Impinj reported revenue of $32.6 million, representing 5% year-over-year growth.

3    Defendants issued guidance for Impinj's fourth quarter 2017 ("4Q17") results, with revenue

4    expected to be in the range of $28.25 million to $29.75 million.

5    29.     The November 1, 2017 press release quoted defendant Diorio as follows:

6              *Our 2017 endpoint IC unit guidance remains unchanged at*
              *between 7.0 and 7.2 billion units*.  We see indicators of growing
7              adoption for RAIN, and the Impinj platform, however, we expect to
              see a slight decrease in endpoint IC volumes in the second half of
8              the year.  We remain confident in our market opportunity and will
9              continue investing in and delivering solutions and enterprise
              partnerships that leverage our platform, accelerate adoption and
10             drive scale in this gigantic market opportunity.

11   30.     Defendants also conducted a conference call with investors and stock analysts on

12   November 1, 2017.   In his prepared remarks, defendant Diorio partially revealed the sales

13   difficulties then being experienced by the Company, though he assured investors that demand was

14   still strong, stating in pertinent part as follows:

15             *We also see strong fourth quarter demand*.  Our market data, sales
              volumes and, for me personally, deep discussions with partners and
16             end users reinforce my belief that the second RAIN adoption wave
              is upon us.  And even as we see that second wave driving significant
17             reader and gateway volume growth, *we see a few percentage points*
18             *decline in second half 2017 endpoint IC unit volumes versus first*
              *half.  The reasons aren't completely clear to us*, but we do not
19             believe our market share has changed materially.

20             Rather, we believe several factors may be in play, *the delays at*
21             *several large retailers, our inlay partners adjusting to our*
              *transition from constrained supply and long lead times mid-2016*
22             *to early 2017 to buffer stock and short lead times now* . . . .  Over
              time, we expect our endpoint IC growth rates to return from this
23             year's 18% to more historical norms, albeit with continued
              volatility.
24
25             In the meantime, *we are seeing a few percentage points larger*
              *endpoint IC price erosion than we planned in the second half of*
26             *2017 due to stiffened competition in a time of slower growth*,
              causing a modest decline in second half 2017 endpoint IC gross

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264



1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

margins rather than the increases we saw in the past years.  ***In light of these new market dynamics, we are rebalancing inventory***, ramping reader and gateway production and slowing endpoint IC production.

31.     Defendant Fein also made the following disclosures about the problems Impinj faced with inventory and production on the November 1, 2017 conference call, stating in pertinent part as follows:

> [W]e will moderate endpoint IC production consistent with our plan to have 1 billion units of endpoint IC buffer at year-end, at the same time ramping reader and gateway production.

> As Chris also noted, ***our fourth quarter outlook is impacted by a decline in endpoint IC demand*** as well as by insufficient reader and gateway inventory, with the latter causing us to push meaningful revenue into 2018.

32.     During the conference call, defendant Diorio engaged in the following exchange with Thomas Walkley, a Canaccord Genuity analyst, regarding whether the results indicated Impinj was losing market share:

> [Walkley:]  ***[C]an you talk about just the decline year-over-year and why you don't think maybe it's a share loss of EBIT on a short-term basis***?  Just how do you think about your relative share given the softer second half of the year versus the first half when your retailers should be a little stronger on a seasonal basis?

> . . . [Diorio:]  As I said, ***we believe that there's a couple of factors*** in play.  One is, again, the delay, with several large retailers not introducing those large step function increases.  And number two is our ***inlay partners adjusting from a transition where we had constrained supply and long lead times to us having buffer stock and short lead times now***.

> And another one is some seasonality in resale deployment timing, which our previously long lead times may have masked.  ***And so we're actually seeing a bit of slowness in sort of those deployments in Q4, which previously we sort of drove right through because we had long lead times and significant pending orders.  But now our inlay customers are ordering mainly at the time that they need [to] – or closer to the time that they need the product***.  And so we are seeing a little bit of seasonality in Q4, especially in terms of new deployments.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

. . . [W]e don't believe that our endpoint IC market share has changed materially.

. . . [Walkley:]  Can you kind of walk us through . . . just kind of how you see the market developing over the course of '18 to think about 20% or greater endpoint growth next year?

[Diorio:]  Sure.  *So we do see some volatility on a quarter-by-quarter basis*, both due to timing and due to any particular opportunity ramping up. . . . [I]f you look back to last year, we were, essentially in allocation, we didn't have enough product.  And . . . so we have long lead times, and *we see a normalization happening now as we accommodate basically a new dynamic* where we have sufficient product to meet the demand.  And so what we see at least is sort of an underlying growth rate in the industry that's more along the lines of historical norms.  And we expect our volumes to approach and get closer to those historical norms over time.

33.    On this news, the price of Impinj common stock fell over $11 per share, or more than 34%, to close at $21.55 per share on November 2, 2017, on unusually high trading volume of 7.5 million shares traded.  However, Impinj's stock continued to trade at artificially inflated prices because defendants continued to conceal and misrepresent material facts regarding Impinj's business metrics, operations and financial prospects.

34.    The statements referenced above in ¶¶ 14–18, 20–26 and 28–32 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts known by defendants during the Class Period:

(a)    The addition of large customers in 2016 had driven a contraction in Impinj's ability to fulfill its production obligations, which resulted in lead times between 10 and 12 weeks instead of the normal baseline time range of 4 to 6 weeks;

(b)    Increased sales of IC endpoints were not indicative of strong demand being driven by increased product adoption, but rather, they were the result of customers purchasing increased inventory to account for extended production lead times;

(c)    Impinj lacked adequate accounting and reporting controls; and


HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

(d)     As a result of the foregoing, defendants' statements about the Company's business metrics, operations, and financial prospects were false and misleading and/or lacked a reasonable basis at the time the statements were made.

35.     On February 1, 2018, Impinj issued a press release announcing preliminary 4Q17 revenues.  The release stated that Impinj now expected fourth quarter revenue of only $29.0 million and $30.0 million and that it had lowered its first quarter 2018 ("1Q18") revenue guidance to just $20 million to $22 million.  Defendants also disclosed that defendant Fein, who had been with Impinj for 17 years, was resigning as its CFO, without explanation other than he was pursuing other opportunities.

36.     The February 1, 2018 press release included the following quote attributed to defendant Diorio:

> *Turning to first quarter 2018, our shortened endpoint IC lead times have contributed to a reduction in our endpoint IC order backlog as well as ongoing reductions in inlay-partner inventory*.  Consequently, despite continued growth in endpoint IC consumption and in the number of deployments by end users, *we currently anticipate softness in our endpoint IC volumes and first quarter revenue of $20 to $22 million* . . . .

37.     On this news, the price of Impinj common stock declined more than $10 per share, or nearly 47%, to close at $12.16 per share on February 2, 2018, on unusually high trading volume of 11.7 million shares traded.

38.     On February 15, 2018, Impinj issued a press release announcing its 4Q17 and fiscal year 2017 ("FY17") financial results for the period ended December 31, 2017.  Impinj reported 4Q17 revenues of $26.9 million, representing 20% year-over-year growth.  Defendants issued guidance for Impinj's 1Q18 results, with revenue expected to be in the range of $23.25 million to $25.25 million.

39.     Defendants conducted a conference call with investors and stock analysts on February 15, 2018.  In his prepared remarks, defendant Diorio discussed Impinj's continued decline in sales performance, stating in pertinent part as follows:

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264

- 12 -



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

Rather than provide annual endpoint IC guidance in 2018 as we have done in the past, we will instead provide quarterly revenue results for endpoint ICs and for systems, the latter comprising our platform's connectivity and software layers. ***We believe this segmentation better aligns with how we view our business and how we track the fixed reading adoption wave I have discussed on prior calls***.

***Starting with endpoint ICs.  Our endpoint IC lead times have contracted from an average of 10 to 12 weeks in 2016 to an average of 4 to 6 weeks today.  As a consequence, we have seen a significant reduction in our order backlog, and we expect our inlay partners to further reduce their inventory*** by between 500 million and 1 billion units, mostly in the first and second quarters.  As a result, even though we anticipate 15% to 20% growth in end user endpoint IC consumption in 2018, ***our first half 2018 unit volume growth will lag end user consumption***.

40.     On the call, defendant Fein disclosed the reason the Company's 4Q17 results came in below the revised guidance defendants had issued just two weeks before, stating in pertinent part as follows:

Fourth quarter revenue was $26.9 million, compared with $33.7 million in the fourth quarter of 2016, below the preliminary estimates we announced in our February 1 pre-release.  After that pre-release, ***we agreed to a partner's request for a onetime product exchange, requiring us to take an accounting reserve and decrease our 2017 revenue by $3.2 million.  There is also a decrease to our cost of sales and an increase to our inventory***.  We expect to reverse this reserve in the first quarter of 2018 when we complete the exchange and recognize $3.2 million in revenue at that time.  We increased our first quarter guidance by this $3.2 million reserve.

41.     Analysts immediately sought answers about defendants' revelations concerning Impinj's lead times.  Troy Jensen, an analyst with Piper Jaffray, began the question-and-answer period with the following exchange:

[Jensen:]  First of all, just can you help explain, if we're talking about a 6-week reduction in lead times, why do you think it's going to take 2 quarters to achieve this inventory depletion?

*          *          *

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264

- 13 -



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1   [Brodersen:]  I think as you think through the inventory correction,
2   a couple of things.  ***Really, when you take a look at the history of
    our business over the last couple of quarters, as we guided and
3   evidenced by our guide middle of last summer, we saw demand
    beginning to adjust downward and saw our backlog decline
4   through the second half with really no corresponding customer
    inventory change.  But as our lead times have normalized back
5   down around that 4- to 6-week level, down from 10 to 12, inlay
    customers are adjusting their inventory to our new lead times***.  So
6   to quantify that, if you look at 2017 volumes, we ship about 140
    million units a week.  So a 4- to 8-week lead time contraction
7   equates to roughly 500 million to 1 billion units.   And the
8   confirmation on that is really linked to our detail bottoms-up work
    that we've been undergoing with our inlay customers over the last
9   few weeks as we have been finalizing our annual negotiations,
    which also centers around a corresponding reduction right in that
10  same range.  So we feel like that, that's a very solid assessment of
11  inventory drawdown.

12     42.   Craig Hettenbach pressed defendants further on the inventory and lead time issues

13  in the following exchange:

14   [Hettenbach:]  Just a question following up on the lead times.  If you
15   can discuss kind of just some of the background there in terms of as
     they are stretched and then just things you might look to do to assess
16   that on go-forward basis in terms of being able to perhaps maybe
     manage the lead times differently.

17   . . . [Brodersen:]  I think the expansion in the market that we saw in
18   '16, having inspired growth rates in that time period, really drove as
     we've highlighted before, a contraction in our ability to supply.  And
19   in certain cases, we had to extend our lead times, as we said, into
     that 10- to 12-week range.  ***What we're at today in that 4 to 6 range
20   is the normal baseline that we expect to run the business against***.

21     43.   Brad Erickson continued the line of questions regarding when defendants learned

22  about the excess inventory in the following exchange:

23   [Erickson:]  First, can you talk through the – just curious to get a
24   sense of talking through the timing of when you came to understand
     the excess inventory at the inlay partners during the quarter.  And I
25   guess, curious if it came up kind of simultaneously or did you sort
     of discover them one at a time as you [were] going through different
26   points in the quarter?

HAGENS BERMAN
1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

[Brodersen:] Brad, I think it's best to highlight that as part – *the deepest understanding really is driven by the detailed work we're doing in our negotiations around annual supply agreements and pricing negotiations and continued work in measuring and managing and triangulating with our customers around their expected demand and their corresponding inventory position. So it's really been over the last, as I said, few weeks, quarter or so*.

44.    On this news, the price of Impinj common stock fell another $2.36 per share, or 17.5%, to close at $11.07 per share on February 16, 2018, on unusually high trading volume of 5.9 million shares traded.

45.    On August 2, 2018, Impinj announced that it was delaying the release of its second quarter 2018 ("2Q18") results for the period ended June 30, 2018, its 2Q18 investor conference call, and the filing of its 2Q18 financial report with the SEC.  The Company also disclosed that in response to having received a complaint from a former employee, the Audit Committee of Impinj's Board of Directors had commenced an independent investigation and had retained independent counsel to assist in the investigation.  Impinj further disclosed that the SEC had been notified of the former employee's complaint and the Audit Committee's investigation into it.  Impinj stated that it could not "predict the duration or outcome of the investigation, and [would] not be in a position to file [its] Form 10-Q until the Audit Committee complete[d] its investigation."

46.    Impinj also announced preliminary 2Q18 financial results that day, disclosing that it had reduced its bloated inventory balance by $1.4 million, to approximately $53.3 million.

47.    On this news, Impinj's share price fell $3.02 per share, or nearly 14%, on August 3, 2018, on heavy trading volume of 914,100 shares traded.

48.    On August 13, 2018, Impinj disclosed that it had been notified by the NASDAQ that its failure to timely file its 2Q18 financial report took it out of compliance with NASDAQ's listing requirements and that a failure to bring the financial reports current could result in its common stock being delisted.


1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

**NO SAFE HARBOR**

49.     Most of the false and misleading statements described herein related to existing facts or conditions and the Safe Harbor provisions have no applicability to such statements.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they too are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. § 78u-5(b)(2)(A).

50.     Impinj's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were also ineffective to shield those statements from liability.  Defendants are liable for any false or misleading forward-looking statements because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer and/or director of Impinj who knew that the forward-looking statement was false.  In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

**ADDITIONAL SCIENTER ALLEGATIONS**

51.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Impinj, their control over, and/or their associations with the

HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

Company, which made them privy to confidential proprietary information concerning Impinj, participated in the fraudulent scheme alleged herein.

52.    In addition, during the Class Period defendant Fein sold 47,207 shares of his Impinj stock for proceeds of more than $1.9 million.  Likewise, defendant Broderson unloaded 43,900 shares of his Impinj stock during the Class Period for proceeds of more than $1.75 million.  These sales were suspicious in both timing and amount and took advantage of the price of Impinj stock being artificially inflated by the defendants' false and misleading statements.

<div align="center">

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD-ON-THE-MARKET DOCTRINE**

</div>

53.    At all relevant times, the market for Impinj stock was an efficient market for the following reasons, among others:

(a)    Impinj's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    The Company had more than 21.3 million shares of stock outstanding as of May 8, 2018, and during the Class Period, Impinj stock was traded on a daily basis, demonstrating a very active and broad market for Impinj stock and permitting a very strong presumption of an efficient market;

(c)    as a regulated issuer, Impinj filed periodic public reports with the SEC;

(d)    Impinj regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    Impinj was followed by many securities analysts who wrote reports that were distributed during the Class Period and were publicly available and entered the public marketplace; and

(f)    unexpected material news about Impinj was rapidly reflected in and incorporated into the prices of the Company's securities during the Class Period.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

54.     As a result of the foregoing, the market for Impinj securities promptly digested current information regarding Impinj from publicly available sources and reflected such information in the prices for Impinj's securities.  Under these circumstances, all purchasers of Impinj securities during the Class Period suffered similar injury through their purchase of Impinj securities at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

55.     During the Class Period, as detailed herein, defendants made false and misleading statements and omitted material information concerning Impinj's business fundamentals and financial prospects and engaged in a scheme to deceive the market.

56.     By artificially inflating and manipulating the prices for Impinj securities, defendants deceived plaintiff and the Class and caused them losses when the truth was revealed. When defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Impinj stock fell precipitously as the prior artificial inflation came out of the stock's price.  As a result of their purchases of Impinj securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

57.     This is a class action on behalf of all purchasers of Impinj publicly traded securities during the Class Period (the "Class").  Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families, and defendants' legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

58.     Class members are so numerous that joinder of them is impracticable.

59.     Common questions of law and fact predominate and include:

       (a)     whether defendants violated the Exchange Act;

       (b)     whether defendants omitted and/or misrepresented material facts;

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264



HAGENS BERMAN
1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1          (c)      whether defendants knew or recklessly disregarded that their statements

2    were false;

3          (d)      whether the prices of Impinj securities were artificially inflated during the

4    Class Period; and

5          (e)      the extent of and appropriate measure of damages.

6    60.    Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions

7    would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of

8    the Class.   A class action is superior to other available methods for the fair and efficient

9    adjudication of this controversy.

10                                        **COUNT I**

11                         **For Violation of § 10(b) of the Exchange Act**
                           **and Rule 10b-5 Against All Defendants**

12    61.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

13    62.    Throughout the Class Period, defendants, in pursuit of their scheme and continuous

14    course of conduct to inflate the market prices of Impinj securities, had the ultimate authority for

15    making, and knowingly or recklessly made, materially false or misleading statements or failed to

16    disclose material facts necessary to make the statements made, in light of the circumstances under

17    which they were made, not misleading.

18    63.    During the Class Period, defendants carried out a plan, scheme, and course of

19    conduct using the instrumentalities of interstate commerce and the mails, which was intended to

20    and, throughout the Class Period, did: (a) artificially inflate and maintain the market prices of

21    Impinj securities; (b) deceive the investing public, including plaintiff and other Class members, as

22    alleged herein; (c) cause plaintiff and other members of the Class to purchase Impinj securities at

23    inflated prices; and (d) cause plaintiff and other members of the Class losses when the truth was

24    revealed.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and

25    each of them, took the actions set forth herein, in violation of § 10(b) of the Exchange Act and

26    Rule 10b-5, 17 C.F.R. § 240.10b-5.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

64.     In addition to the duties of full disclosure imposed on defendants as a result of their affirmative false and misleading statements to the investing public, defendants had a duty to promptly disseminate truthful information with respect to Impinj's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete and accurate information. SEC Regulations S-X (17 C.F.R. § 210.01, *et seq.*) and S-K (17 C.F.R. § 229.10, *et seq.*).

65.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

66.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market prices of Impinj securities were artificially inflated during the Class Period.  In ignorance of the fact that the market prices of Impinj securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by defendants, or upon the integrity of the market in which the shares traded, plaintiff and other members of the Class purchased Impinj securities during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

67.     Had plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by defendants, plaintiff and the other members of the Class would not have purchased Impinj shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices they paid.

68.     By virtue of the foregoing, defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10-5.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## COUNT II

### For Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

69.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

70.     The Individual Defendants had control over Impinj and made the material false and misleading statements and omissions on behalf of Impinj within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements plaintiff contends were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

71.     In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

72.     By reason of such wrongful conduct, each of the Individual Defendants is liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264



HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1        B.     Awarding compensatory damages in favor of plaintiff and the other Class members

2 against all defendants, jointly and severally, for all damages sustained as a result of defendants'

3 wrongdoing, in an amount to be proven at trial, including interest thereon;

4        C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in

5 this action, including counsel fees and expert fees; and

6        D.     Awarding such other and further relief as the Court may deem just and proper.

7 <div align="center">**JURY DEMAND**</div>

8      Plaintiff demands a trial by jury.

9 DATED:  August 27, 2018             HAGENS BERMAN SOBOL SHAPIRO LLP

10                             By: s/ Steve W. Berman

11                             By: s/ Karl P. Barth

12                             STEVE W. BERMAN, WSBA #12536
KARL P. BARTH, WSBA #22780

13  1918 8th Avenue, Suite 3300
Seattle, WA  98101

14  Telephone:  206/623-7292
206/623-0594 (fax)

15  steveb@hbsslaw.com
karlb@hbsslaw.com

16

17  ROBBINS GELLER RUDMAN
    & DOWD LLP

18  SAMUEL H. RUDMAN
DAVID A. ROSENFELD

19  MARY K. BLASY
58 South Service Road, Suite 200

20  Melville, NY  11747
Telephone:  631/367-7100

21  631/367-1173 (fax)

22  ROBBINS GELLER RUDMAN
    & DOWD LLP

23  DAVID C. WALTON

24  655 West Broadway, Suite 1900
San Diego, CA  92101

25  Telephone:  619/231-1058
619/231-7423 (fax)

26

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264

<div align="center">- 22 -</div>



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

HOLZER & HOLZER, LLC
COREY D. HOLZER
1200 Ashwood Parkway, Suite 410
Atlanta. GA  30338
Telephone: 770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiff

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS2:18-cv-01264



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594