THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| In re Impinj, Inc., Securities Litigation. | CASE NO.:  3:18-CV-05704-RSL |
|---|---|
| | **DEFENDANTS' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT** |
| | NOTE ON MOTION CALENDAR: May 3, 2019 |
| | ORAL ARGUMENT REQUESTED |

**FILED PROVISIONALLY UNDER SEAL PURSUANT TO LOCAL RULE 5(g)(3)**

**DEFENDANTS' MOTION TO DISMISS**
3:18-CV-05704 RSL

**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................... 1

STATEMENT OF ALLEGED FACTS........................................................................ 1

ARGUMENT ..................................................................................................... 6

I.   THE PSLRA IMPOSES HEIGHTENED PLEADING STANDARDS............................ 6

II.  THE COMPLAINT FAILS TO ADEQUATELY PLEAD FALSITY.............................. 6

    A.   Statements Regarding Location Are Not False or Misleading ............................. 7

        i.   The Complaint Deliberately Uses Non-Particularized Terms ................... 7

        ii.  Confidential Witnesses Do Not Support Falsity ........................................ 8

        iii. ████████████████████████████████████ ................... 11

    B.   Statements Regarding Demand Are Not False or Misleading ............................. 12

        i.   Pre-Q1 2017 Statements of Increased Demand Are Not Actionable........ 12

        ii.  Accurate Historical Statements Are Not Actionable ................................ 12

        iii. Statements of "Strong" or "Increased" Demand Are Not Actionable ................................................................................................. 13

        iv.  CW3 Does Not Support Falsity of Demand-Related Statements ............. 14

III. THE COMPLAINT FAILS TO ADEQUATELY PLEAD SCIENTER......................... 14

    A.   Plaintiff Does Not Plead a Strong Inference of Scienter as to Locationing.......... 15

    B.   Plaintiff Does Not Plead a Strong Inference of Scienter as to Demand .............. 17

    C.   ████████████████████████████████████ ................. 18

    D.   No Other Facts Alleged Give Rise to a Strong Inference of Scienter ................. 19

        i.   Generic Motive Allegations Do Not Support an Inference of Scienter ................................................................................................... 19

        ii.  Defendants' Roles and Responsibilities Do Not Support Scienter........... 19

        iii. Impinj's Internal Control Weaknesses Do Not Support Scienter ............. 20

        iv.  The Departure of Impinj's CFO Does Not Support Scienter.................... 20

**DEFENDANTS' MOTION TO DISMISS**
3:18-CV-05704 RSL

-i-

**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

E.      Viewed Holistically, the Non-Culpable Inference is More Compelling.......................................................................... 20

IV.    THE COMPLAINT DOES NOT PLEAD LOSS CAUSATION AS TO LOCATION ...................................................................................... 21

V.     THE COMPLAINT FAILS TO STATE A CLAIM AGAINST MR. BRODERSEN......................................................................................... 23

VI.    THE COMPLAINT FAILS TO STATE A SECTION 20(a) CLAIM ............................. 24

CONCLUSION........................................................................................................... 24

**DEFENDANTS' MOTION TO DISMISS**
3:18-CV-05704 RSL

-ii-

**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Brodsky v. Yahoo! Inc.*,
592 F. Supp. 2d 1192 (N.D. Cal. 2008) ...................................................................9, 14

*Brodsky v. Yahoo! Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009) ...........................................................................16

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ...........................................................................................19

*City of Marysville Gen. Emps. Ret. Sys. v. Nighthawk Radiology*,
2011 WL 4584778 (D. Idaho Sept. 12, 2011).................................................................16

*City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..........................................................................9

*City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*,
691 F. App'x 393 (9th Cir. 2017) ......................................................................................9

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017) .........................................................................................20

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).................................................................................................6, 22

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011).................................................................................................6, 21

*In re Cerner Corp. Sec. Litig.*,
425 F.3d 1079 (8th Cir. 2005) ...................................................................................14, 18

*In re Copper Mountain Sec. Litig.*,
311 F. Supp. 2d 857 (N.D. Cal. 2004) .......................................................................11, 14

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ...........................................................................24

*In re Jones Soda Co. Sec. Litig.*,
2009 WL 1794278 (W.D. Wash. June 22, 2009)................................................................8

*In re Jones Soda Co. Sec. Litig.*,
393 F. App'x 507 (9th Cir. 2010) ......................................................................................8

*In re Medicis Pharm. Corp. Sec. Litig.*,
689 F. Supp. 2d 1192 (D. Ariz. 2009) .......................................................9, 10, 16, 19

*In re Metawave Commc'ns Corp. Sec. Litig.*,
298 F. Supp. 2d 1056 (W.D. Wash. 2003) ......................................................................10

DEFENDANTS' MOTION TO DISMISS
3:18-CV-05704 RSL

-iii-

WILSON SONSINI GOODRICH & ROSATI, P.C.
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

*In re Metawave Commc'ns Corp. Sec. Litig.*,
  629 F. Supp. 2d 1207 (W.D. Wash. 2009)..............................................11, 17

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ..................................................................22, 23

*In re Remec Inc. Sec. Litig.*,
  415 F. Supp. 2d 1106 (S.D. Cal. 2006)..........................................................17

*In re SCB Computer Tech., Inc.*,
  149 F. Supp. 2d 334 (W.D. Tenn. 2001)........................................................17

*In re Silicon Graphics, Inc. Sec. Litig.*,
  970 F. Supp. 746 (N.D. Cal. 1997) ................................................................15

*In re Silicon Graphics Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ..................................................................14, 15

*In re Splash Tech. Holdings Sec. Litig.*,
  160 F. Supp. 2d 1059 (N.D. Cal. 2001) .........................................................13

*In re Velti PLC Sec., Litig.*,
  2015 WL 5736589 (N.D. Cal. Oct. 1, 2015)...........................................11, 14

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..........................................................15

*Janus Capital Grp. v. First Deriv. Traders*,
  564 U.S. 135 (2011)........................................................................................24

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) .........................................................................12

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) .................................................................14, 24

*Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*,
  576 F.3d 172 (4th Cir. 2009) ..........................................................................20

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ........................................................6, 8, 11,
  19, 22

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) .....................................................................22, 23

*Or. Pub. Emps. Ret. Fund v. Apollo Grp.*,
  774 F.3d 598 (9th Cir. 2014) ..........................................................................22

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ........................................................................15

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ............................................................................6

**DEFENDANTS' MOTION TO DISMISS**
3:18-CV-05704 RSL
-iv-
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) .................................................................13

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) .............................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................15, 20

*Webb v. SolarCity Corp.*,
    884 F.3d 844 (9th Cir. 2018) .............................................................19

*Zucco Partners v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .........................................................*passim*

**STATUTES**

15 U.S.C. § 78t...........................................................................................24

15 U.S.C. § 78u-4(b)(1) ...............................................................................6

15 U.S.C. § 78u-4(b)(2) ...............................................................................6

15 U.S.C. § 78u-4(b)(2)(A) .........................................................................15

15 U.S.C. § 78u-4(b)(3)(A) .........................................................................15

15 U.S.C. § 78u-4(b)(4) ...............................................................................21

Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 ................ *passim*

Private Securities Litigation Reform Act, S. Rep. No. 104-98 (1995) .........................21

Securities Exchange Act Section 10(b), 15 U.S.C. § 78j(b) ........................................6, 22

**RULES**

Fed. R. Civ. P. 9(b) .......................................................................................6

Fed. R. Civ. P. 12(b)(6)................................................................................1

Rule 10b-5, 17 C.F.R. 240.10b-5.............................................................1, 6

**DEFENDANTS' MOTION TO DISMISS**
3:18-CV-05704 RSL

-v-

**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

1
2
3
4
5

Pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6) and the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), Impinj, Inc. ("Impinj" or the "Company"), Dr. Chris Diorio, Evan Fein, and Eric Brodersen ("Individual Defendants," collectively with the Company, "Defendants") move to dismiss the Consolidated Class Action Complaint, ECF No. 35 ("Complaint" or "¶ _"), for failure to state a claim.

## INTRODUCTION

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

Impinj is the pioneer of RAIN radio-frequency identification ("RFID") technology used to tag and wirelessly connect everyday items to the digital world.  Plaintiff alleges that Impinj and three of its executives committed securities fraud by misrepresenting that the Company's Platform could locate items and that demand for the Company's endpoint integrated circuits ("ICs"), small ICs embedded in tags or labels, was increasing.  At first glance, Plaintiff appears to paint a striking and colorful portrait of deception.  However, upon closer examination, as is required by the PSLRA, it is clear that Plaintiff's pleading palette is full of purposefully vague and conclusory allegations, unreliable and poorly positioned confidential witnesses, and out-of-context statements.  Plaintiff's methods include using broad brush strokes meant to distort Impinj's multiple products as a single product, glossing over inconvenient facts, and whitewashing inherent contradictions.  Plaintiff's materials and methods do not satisfy the heightened pleading requirements of the PSLRA.  The Complaint fails to state a claim and must be dismissed because it does not plead falsity with particularity, does not create a strong inference of scienter, and does not allege loss causation as to its fundamental claim.

## STATEMENT OF ALLEGED FACTS

21
22
23
24
25
26
27

Impinj, a public company headquartered in Seattle, Washington, pioneered RAIN RFID technology that wirelessly connects billions of physical items to the digital world.  ¶¶ 1, 2, 20. Items such as apparel, automobile parts, drivers' licenses, food, and luggage can be connected to applications for inventory management, asset tracking, and item authentication to deliver real-time information to businesses about the items they create, manage, transport, and sell.  Watts Declaration, Exhibit ("Ex.") 2 (July 20, 2016 S-1/A ("S-1")) at 1.  Impinj offers a complete

RAIN platform consisting of endpoint ICs, connectivity devices, and software.  ¶¶ 20, 25.

*Endpoint ICs.*  An endpoint IC is a small IC chip with a digital identifier programmed into it that is paired with a small antenna and placed in disposable tags or labels that are attached to items.  ¶¶ 1, 25; Ex. 2 (S-1) at 84.  Endpoint ICs are devices that lack their own locationing capabilities; rather, readers supply power to endpoint ICs and read data from or write data to them.  *Id.* at 79, 84.  Impinj has sold endpoint ICs since 2005 under the brand name Monza and, as of the end of 2015, had shipped more than 13 billion of them, capturing 65% of the endpoint IC market.  *Id.* at 56, 57, 82, 84.  With sales ramping greatly since the IPO, the Company sold over 7 billion endpoint ICs in 2017 alone.  Ex. 3 (4Q17 Call) at 4.

*Connectivity Devices.*  A reader is a hand-held or stationary electronic device containing one or more reader ICs, one or more antennas, and embedded firmware.  Readers communicate with endpoint ICs through radio signals.  ¶ 25.  When within range, endpoint ICs respond to the reader's signals with their digital identifiers, which the reader then relays to a software layer. Impinj offers three connectivity products: reader ICs, stationary readers, and gateways.  Ex. 2 at 1.  Impinj's reader ICs, branded Indy, can be embedded in third-party products such as handheld readers and stationary readers.  *Id.* at 56, 81, 84.  Impinj entered the reader IC market in 2008, and by the end of 2015, it held about 61% of the market share.  *Id.* at 56–57.  Impinj's stationary readers, branded Speedway, are fully contained readers installed in a single location.  *Id.* at 56, 85; Ex. 4 (FY16 10-K) at 6.  Impinj entered the stationary reader market in 2006.  Ex. 2 at 56. Impinj's gateways combine Speedway readers with antenna arrays that steer a radio beam like a searchlight enabling gateways to not only interact with endpoint ICs, but also to determine their location.  *Id*.  As of the IPO, Impinj sold two different gateways, both with a commercially deployable locationing feature: xPortal, introduced in 2010, scans doorways, hallways, or other transition areas, while xArray, introduced in 2014, scans up to 1,500 square feet of floor space. *Id.* at 56, 85.  By the time of Impinj's IPO, the Company had sold over 1 million reader ICs, stationary readers, and gateways.  *Id*. at 84.

**DEFENDANTS' MOTION TO DISMISS**
3:18-CV-05704 RSL

-2-

**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

1    ***Software.***   The software layer of Impinj's RAIN platform includes ItemSense, an

2    operating system that extracts the data that connectivity devices collect from endpoint ICs and

3    presents it in a usable format.   *Id*. at 56, 85.   Impinj did not enter the software business until

4    October 2015, and disclosed throughout the class period that software sales accounted for an

5    immaterial portion of its revenue.   *Id*. at 56, 86; Ex. 4 (FY16 10-K) at 53.

6    ***The Impinj Platform.***   Impinj refers to these three product layers together as the Impinj

7    "Platform."   ¶¶ 5, 26.   Within each layer of its Platform it sells one or more product families.   Ex.

8    2 (S-1) at 83–85.   When used together, these products can provide the customer with what Impinj

9    refers to as "Item Intelligence," described as an "item's unique identity, location and

10   authenticity."   ¶¶ 5, 26.   Impinj states that it is the only company in the industry that offers an

11   end-to-end RAIN-based platform.   Ex. 2 at 83.   That said, these products are not usually sold as a

12   complete platform.   The RAIN standard is freely available to any company that wants to develop

13   products within it, and multiple companies have done just that.   *Id.* at 79; *see id.* at 14 (listing

14   competitors in each layer).   While Impinj's three product layers *can* be used together as a unified

15   platform, they do not *need* to be, and sales of one product do not depend upon sales of other

16   products within the Platform.   The reported sales numbers during the class period demonstrate

17   this.   For example, while endpoint IC sales grew sharply in 2016, Impinj reported that reader and

18   gateway sales grew only 11.2%.   Ex. 4 (FY16 10-K) at 60.   The reverse trend occurred in late

19   2017, when the Company simultaneously reported "a decline in endpoint IC demand" and

20   growth in reader and gateway sales of 68%.   Ex. 5 (3Q17 Call) at 4–6.

21   ***Initial and Secondary Public Offerings.***   On July 21, 2016, the first day of the proposed

22   class period, the Company completed its IPO based on a July 20, 2016 registration statement and

23   July 21, 2016 prospectus.   ¶¶ 31, 85–86.   It held a secondary public offering based on a

24   November 28, 2016 registration statement and a December 2, 2016 prospectus.   ¶¶ 32, 114–15.

25   ***Impinj Disclosed Difficulties Forecasting Demand***.   Impinj included robust risk

26   disclosures in the offering documents and each of its subsequent 10-Qs and 10-K warning that

27   the Company's "visibility to end-user demand is limited and uncertain," Ex. 2 at 6; Ex. 6 (Nov.

28, 2016 SPO S-1) at 6; Ex. 4 (FY16 10-K) at 28; Ex. 7 (1Q17 10-Q) at 37, that the Company has had "limited success in accurately predicting future sales of our products and platform" and "expect[s] . . . for the foreseeable future [that] our visibility into future sales, including both volumes and prices, will continue to be limited." Ex. 2 (S-1) at 13; Ex. 6 (SPO S-1) at 13; Ex. 4 (FY16 10-K) at 16; Ex. 7 (1Q17 10-Q) at 26.  The Company disclosed that because it does not sell directly to end-users, it struggles to forecast demand and that "[d]emand uncertainties, by our channel partners and us, cause significant forecast inaccuracies." Ex. 2 at 24–25; Ex. 6 at 25, Ex. 4 at 28; Ex. 7 at 37.  It also disclosed that its "estimates of channel-partner and end-user demand have historically been inaccurate" and "[s]ome of the inaccuracies have been material, leading to excess inventory with associated costs or product shortages with its concomitant loss of revenue and gross margin." *Id*.

*Unprecedented Demand for Endpoint ICs in 2016 and Early 2017*.  Following its IPO, Impinj experienced strong endpoint IC sales results.  On November 7, 2016, Impinj reported Q3 2016 revenue of $31 million (50% growth from Q3 2015). Ex. 8 (3Q16 10-Q/A) at 19.  This was a huge upswing from its *combined* $47.6 million in revenue for Q1 and Q2 2016.  *Id*.  On February 16, 2017, Impinj reported a *record* $33.7 million in revenue for Q4 2016, which it attributed to increased demand for its endpoint ICs.  ¶ 130.  For fiscal year 2016, Impinj reported $112.3 million in revenue (43% growth over fiscal year 2015).  Ex. 9 (4Q16 Call) at 3.  With demand for endpoint ICs looking strong, Impinj projected Q1 2017 revenue of $30–$31.5 million.  *Id*. at 6.  On May 4, 2017, Impinj reported a "strong first quarter" with revenue of $31.7 million, exceeding its forecast. Ex. 10 (1Q17 Call) at 3. On August 3, 2017, Impinj announced a "strong second quarter, with revenue growing 31% year-over-year to $34.1 million," a new quarterly revenue record for the Company.  Ex. 11 (2Q17 Call) at 3.

*Impinj Builds Inventory in Response to Supply Constraints.*  In 2016, Impinj reported difficulty meeting endpoint IC demand.  Thus, it increased its inventory of endpoint ICs throughout 2016 and early 2017.  Ex. 12 (2Q16 Call) at 5; *see* Ex. 9 (4Q16 Call) at 6 ("Consistent with our plan to build inventory to meet increased customer demand, inventory

DEFENDANTS' MOTION TO DISMISS
3:18-CV-05704 RSL
-4-
WILSON SONSINI GOODRICH & ROSATI, P.C.
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

1  increased by $7.2 million . . . ."); Ex. 10 (1Q17 Call) at 6; Ex. 11 (2Q17 Call) at 6.

2       ***In the Second Half of 2017, Endpoint IC Demand Wanes While Reader and Gateway***

3  ***Demand Surges.***  On August 3, 2017, at the same time Impinj announced record revenue of

4  $34.1 million for Q2 2017, Ex. 11 at 3, it also reported that upon entering Q3 2017 it began to

5  see several large end-users "delaying planned expansions." *Id.* at 4.  Thus, the Company reduced

6  its fiscal year 2017 endpoint IC forecast from 7.8–8.0 billion units to 7.0–7.2 billion units, still

7  "representing 18% growth over 2016 at the midpoint."  *Id.*  Impinj disclosed that certain large

8  end-users had delayed deployments due to "internal process and integration challenges" beyond

9  Impinj's control.  *Id.* at 4, 7.  It also disclosed "strong growth" in its reader and gateway business

10 with unit volumes up 53% in Q2 compared to the same quarter the prior year.  *Id.* at 4.

11      On November 1, 2017, Impinj reported Q3 2017 revenue of $32.6 million.  ¶ 175.  At

12 that same time, it announced that Q4 2017 revenue would be "impacted by a decline in endpoint

13 IC demand" that reflected the deployment issues previously mentioned and an apparent

14 "transition" from where Impinj "had constrained supply and long lead times" to Impinj having

15 "buffer stock" and "short lead times."  ¶ 175; Ex. 5 (3Q17 Call) at 6, 10.  The Company also

16 disclosed 68% year-over-year reader and gateway volume growth that "significantly exceeded

17 our expectations" and "could have been larger" if Impinj could "build enough readers and

18 gateways" to "catch up with the growing demand."  *Id.* at 4–5.

19      On February 1, 2018, before reporting Q4 2017 results, Impinj warned that "softness in

20 . . . endpoint IC volumes" caused by "shortened endpoint IC lead times" and continuing

21 inventory draw-downs by customers would result in Q1 2018 revenue of between $20 and $22

22 million. ¶ 179; Ex. 13 (2/1/18 8-K) at 3.  It also announced CFO Evan Fein's resignation.  ¶ 179.

23      On February 15, 2018, the close of the purported class period, Impinj announced Q4

24 2017 revenue of $26.9 million.  ¶ 182.  Mr. Fein stated the decline was due largely to customer

25 "inventory drawdown."  Ex. 3 (4Q17 Call) at 6, 8.  Impinj reported that reader and gateway

26 growth again exceeded expectations, with unit volumes growing 42% year-over-year.  *Id.* at 4.

27

1

**ARGUMENT**

2

**I.     THE PSLRA IMPOSES HEIGHTENED PLEADING STANDARDS**

3       To state a claim under Section 10(b) of the Securities Exchange Act and Rule 10b-5

4   promulgated thereunder, a plaintiff must allege (1) a material misrepresentation or omission, (2)

5   scienter, (3) a connection with a transaction in a security, (4) reliance, (5) economic loss, and (6)

6   loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005) (citations omitted).

7   A federal securities complaint must satisfy not only Rule 9(b)'s particularity requirement, but

8   also the "formidable" pleading requirements of the PSLRA. *Metzler Inv. GMBH v. Corinthian*

9   *Colls., Inc.*, 540 F.3d 1049, 1054–55, 1070 (9th Cir. 2008).

10      For falsity, "a complaint must 'specify each statement alleged to have been misleading,

11  the reason or reasons why the statement is misleading, and, if an allegation regarding the

12  statement or omission is made on information and belief . . . shall state with particularity all facts

13  on which that belief is formed.'" *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (quoting

14  15 U.S.C. § 78u-4(b)(1)).   For scienter, a "complaint must also 'state with particularity facts

15  giving rise to a strong inference that the defendant acted with the required state of mind'—that

16  is, that he acted with intentionality or deliberate recklessness." *Id.* (quoting 15 U.S.C. § 78u-

17  4(b)(2)).   For loss causation, a plaintiff must plead that the misstatements "proximately caused

18  the plaintiff's economic loss." *Dura*, 544 U.S. at 346.  Where a plaintiff claims losses based on

19  declines in the market price of a stock, loss causation is only established if "a misrepresentation

20  that affected the integrity of the market price *also* caused a subsequent economic loss." *Erica P.*

21  *John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011).

22  **II.    THE COMPLAINT FAILS TO ADEQUATELY PLEAD FALSITY**

23      The Complaint fails to plead the most basic element of a Rule 10b-5 claim—a statement

24  that was false or misleading when made. *Metzler*, 540 F.3d at 1067.  Plaintiff challenges two

25  categories of statements made with only slight variations:  the Platform's location capabilities,

26  ¶¶ 86, 89, 92, 96, 100, 103, 106, 110, 115, 118, 121, 124, 127, 131, 134, 137, 140, 146, and

27  customer demand for Impinj's endpoint ICs, ¶¶ 95, 99, 109, 113, 130, 143, 149. *See* Ex. 1 (Chart

of Allegedly False and Misleading Statements).  Neither category of statements is actionable.

**A.      Statements Regarding Location Are Not False or Misleading**

Thirty of the forty statements Plaintiff alleges as false or misleading relate to location. The vast majority of these statements are variations of the statement that Impinj's technology "delivers each item's unique identity, location, and authenticity."  ¶¶ 86, 89, 92, 96, 103, 106, 110, 115, 118, 121, 124, 127, 131, 134, 137, 140, 146.  A handful of statements provide specific statistics regarding speed, ¶¶ 86 (Platform can "identify[] and locat[e] more than 1,000 items-per-second"), 115 (same), 131 (same), or distance, ¶¶ 86 (endpoint ICs are "readable to 30 feet"), 115, (same), 131 (same), 89 (Platform can "identify specific location of items to within 1.5 feet"), 100 (Platform can locate pallets to "within 1 to 1.5 meters (about five feet)").  Others address use cases, including tracking pallets (¶ 100), medical kits (¶ 131), and logistics  (¶ 137). Plaintiff's theory that these locationing statements are false and misleading is based on a deliberate obfuscation of the alleged location problem and the products involved, statements attributed to three disgruntled former Impinj employees, and out-of-context quotations from a

██████████████████████████████████████████████████████████████████
████████████████████████████████

**i.      The Complaint Deliberately Uses Non-Particularized Terms**

Plaintiff's location allegations are too vague.  Location is not a binary concept, either locating an item or not, as Plaintiff alleges.  First, locationing performance varies based on the user's desired accuracy and cost.  What might be inadequate locationing capability at a given cost for one commercial use, might be perfectly acceptable for another.  For example, using one gateway to locate an item to within 1.5 meters, ¶ 100, might be a very good way to locate a reusable plastic table marker containing an endpoint IC that a customer has carried to a table in McDonald's, Ex. 2 (S-1) at 81, and it certainly is a good way to locate a pallet on a loading dock, ¶ 100, but that solution might not satisfy the requirements of other use cases.  Second, locating an item can mean many different things.  For example, it can mean locating a vehicle part when it passes through a stationary reader in a production line, Ex. 14 (3Q16 Call) at 4, locating an

item as it passes through a dock door, as used by fulfillment and logistics companies to facilitate product transport and distribution, Ex. 10 (1Q17 Call) at 4, locating a runner as he or she crosses a finish line wearing a race bib embedded with an endpoint IC, Ex. 2 at 81, locating which target a golf ball lands in at Topgolf, *id.*, or locating an endpoint IC as being within a roughly 30 foot radius due to the fact that it is within a reader's range.  Neither the CWs nor Plaintiff provide their definitions of "locating," nor do they identify the rubric they use to judge the challenged statements.  And they do not challenge descriptions in the S-1 of any of the locationing solutions described above (which were commercially deployed at the time of the IPO) as false or misleading.  Without providing its definition and identifying the applicable rubric, Plaintiff fails to plead that "Impinj's Platform" does not locate items.

Plaintiff also carefully avoids alleging where among Impinj's three product layers, ¶¶ 1, 25, the problem exists.  Instead, Plaintiff tellingly alleges in as general a way as possible that the "Platform" lacked "basic location capability" or had a "'locationing problem' that rendered it unable to perform its key [or core] function of accurately locating tagged items." ¶¶ 1, 7, 41, 42, 44–50.  Plaintiff pleads these purposefully vague allegations, and does not challenge as false or misleading any of the specific locationing use cases included in Impinj's S-1 in order to obfuscate the nature of the so-called "location problem" because doing otherwise would reveal the contradiction, implausibility, and weakness of Plaintiff's falsity allegations.  *See In re Jones Soda Co. Sec. Litig.*, 2009 WL 1794278, at *3 (W.D. Wash. June 22, 2009) (plaintiff cannot "make defendants' statements false merely by giving them an expansive, but unreasonable interpretation"), *aff'd*, 393 F. App'x 507 (9th Cir. 2010); *Metzler*, 540 F.3d at 1069–70 (CW allegations disregarded if they are opinions, conclusions, or vague assertions).

### ii.   Confidential Witnesses Do Not Support Falsity

The courts have established that statements by so-called confidential witnesses ("CWs"), who often are unhappy former employees, must be considered with great skepticism and a critical eye for facts, as opposed to untethered conclusions.  For this reason, a complaint that relies on CW statements must describe those CWs "with sufficient particularity to establish their

DEFENDANTS' MOTION TO DISMISS
3:18-CV-05704 RSL

-8-

WILSON SONSINI GOODRICH & ROSATI, P.C.
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

reliability and personal knowledge." *Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).  On a PSLRA motion to dismiss, courts consider "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.* (citation omitted).  Here, Plaintiff relies on three former employees—a former Senior Director of Product Management and Marketing ("Director of Product 1" or "CW1"), a former Senior Director of Product Management ("Director of Product 2" or "CW2"), and a former VP of Sales, Strategic Markets ("VP of Sales" or "CW3")—to suggest that Impinj's Platform could not locate items in any usable way.  ¶¶ 7–9, 11, 44–72, 155, 158–160.  These CW allegations lack the requisite indicia of reliability.

The CWs were not in a position to know whether Impinj's Platform provided a workable location feature during the class period.  According to the Complaint, CW1 worked at Impinj for 18 months, and was terminated *before* the Company's July 2016 IPO that starts the class period.  ¶¶ 51, 59.  CW1, therefore, cannot opine as to whether the alleged location issue persisted during the class period.  *See Zucco*, 552 F.3d at 996 (CWs who left before the class period had "only secondhand information"); *City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1135 (E.D. Wash. 2013) (statements of CWs who left before the class period were "unsubstantiated speculation"), *aff'd*, 691 F. App'x 393 (9th Cir. 2017).  According to the Complaint, CW2 was terminated in December 2016, just a few months into the class period, and his duties as a product manager were removed well before then.  ¶ 65.  *See Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1200–01 (N.D. Cal. 2008) ("*Brodsky I*") (CW who "stopped working at Yahoo!" months after the class period began could not show falsity of later statements).

Even assuming the CWs were at the Company during the relevant time period, they worked in product management and sales, not engineering.  Since there is no allegation of relevant technical expertise, their statements about the location abilities of Impinj's technology are not reliable.  *See Zucco*, 552 F.3d at 996–98 ("human-resources employee . . . had no firsthand knowledge of the workings of the finance or corporate departments"); *In re Medicis*

DEFENDANTS' MOTION TO DISMISS
3:18-CV-05704 RSL

-9-

WILSON SONSINI GOODRICH & ROSATI, P.C.
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

*Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1211 n.10 (D. Ariz. 2009) (rejecting CW statement absent allegations of qualifications); *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1070 (W.D. Wash. 2003) ("*Metawave I*") (complaint failed to allege that CW, an engineer, had expertise in accounting). CW2 was responsible for ItemSense, ¶ 62, the Company's fledgling software operating system, not the Company's endpoint ICs or gateways. *See supra* at 2–3. CW3 refers vaguely to "his product line," but omits which product line he worked on. ¶ 69. If CW3 was responsible for any product line other than gateways, his ability to speak to locationing issues would be suspect. And if he worked on any product line other than endpoint ICs, questions would arise as to his knowledge of customer demand for endpoint ICs.

The CWs' lack of expertise is highlighted by their vague and generalized statements that the purported locationing problem was with the "Platform" and their apparent inability to specify which Impinj products provide location, much less identify the defect in those products that supposedly compromises their accuracy. ¶¶ 8, 9, 44, 46. While CW1 claims there were meetings to discuss improving locationing, he does not allege whether this improvement was aimed at Impinj's endpoint ICs, connectivity devices, or the Company's new ItemSense software operating system. ¶ 45. ████████████████████████████████████████████
████████████████████████████████████████ CW2 claims to have been responsible for ItemSense. ¶¶ 44 n.18, 62. Thus, it is certainly plausible, if not probable, that the particular locationing problem CW2 claims was raised ████████████████████████████
████ by others in pre-class period meetings he attended, ¶ 45, and by others he engaged with during his work on ItemSense, ¶¶ 44, 45, 47, related to the abilities of ItemSense itself, and not the locationing capabilities of the Company's gateways like xPortal and xArray which were designed to provide location data. *See supra* at 2. CW3 provides no more detail than alleging that a "location issue" was a topic of conversation in certain sales and executive team meetings. ¶ 46. Interestingly, CW3 does not claim that this "location issue" negatively impacted the Company's sales, generally, or endpoint IC sales, specifically. ¶ 71. Nor does he identify a single lost sale by customer, time period, product, volume, or total potential sales price. *Id*. This

DEFENDANTS' MOTION TO DISMISS
3:18-CV-05704 RSL
-10-
WILSON SONSINI GOODRICH & ROSATI, P.C.
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

dearth of details undermines CW3's reliability.[1]  *See In re Velti PLC Sec., Litig.*, 2015 WL 5736589, at *23 (N.D. Cal. Oct. 1, 2015) (failure to "identify a single receivable in existence at that time that . . . became uncollectible" fatal for bad receivables claim); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 867–68 (N.D. Cal. 2004) (failure to provide "detail regarding the amount of reductions in customer orders" fatal for declining revenue claim).  Such vague allegations must be disregarded.  *See Zucco*, 552 F3d. at 995, 997–98, 1000 (rejecting vague CW allegations); *Metzler*, 540 F.3d at 1069–70 (rejecting CWs' opinions, conclusions, or vague assertions); *In re Metawave Commc'ns Corp. Sec. Litig.*, 629 F. Supp. 2d 1207, 1220–21 (W.D. Wash. 2009) ("*Metawave II*") (rejecting CW statements without "support other than hearsay").

      iii.

---

[1] Plaintiff's attempt to blame Impinj's counsel for CW3's lack of detail is disingenuous.  Rather than warn CW3 that he "should not disclose . . . any confidential business information," (¶ 77 n.25), Impinj's counsel confirmed that Impinj would *not* assert violations of CW3's employment agreement if he chose to speak with and answer Plaintiff's counsel's questions, and further agreed to work with Plaintiff's counsel in sealing any confidential information that CW3 disclosed and Plaintiff's counsel included in the Complaint. Ex. 15 (Jan. 28, 2019 Letter).  On March 11, 2019, Defendants' counsel confirmed with Plaintiff's counsel that the January 28, 2019 letter is the correspondence referenced at ¶ 77 n.25.  *See* Watts Decl. at ¶ 15.  This letter also shows as unfounded the professed "fear" by CWs that Impinj would retaliate against them for speaking to Plaintiff's counsel.  Complaint at 1, ¶ 159 n.30.

DEFENDANTS' MOTION TO DISMISS       -11-       WILSON SONSINI GOODRICH & ROSATI, P.C.
3:18-CV-05704 RSL                                      701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7006
Tel: (206) 883-2500

At the time of Impinj's IPO, in fact, McDonald's was using xArray's location capabilities for direct-to-table service. *Id.* at 81.  Thus, Plaintiff's attempt to spin out-of-context snippets ▮▮▮▮▮ actually undermines Plaintiff's theory that Impinj did not offer locationing to within 1.5 meters. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (decrying pleading practice of "selecting only portions of documents that support [plaintiffs'] claims, while omitting portions of those very documents that weaken—or doom—their claims"); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998) (courts "are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.").

**B.      Statements Regarding Demand Are Not False or Misleading**

      i.      <u>Pre-Q1 2017 Statements of Increased Demand Are Not Actionable</u>

Plaintiff repeatedly alleges that the "decline in demand began in the first quarter of 2017." ¶¶ 11, 71, 76.  This allegation precludes Plaintiff from claiming that six of the ten demand-related statements are false or misleading, as each was made *before* Q1 2017.  ¶¶ 95 (Aug. 31, 2016), 99 (Sept. 2, 2016), 109 (Nov. 3, 2016), and 113 (Nov. 15, 2016).

      ii.      <u>Accurate Historical Statements Are Not Actionable</u>

Even if the decline was identified at the very beginning of Q1 2017, the two challenged demand-related statements made on February 16, 2017 (¶ 130) are still inactionable because they

**DEFENDANTS' MOTION TO DISMISS**
3:18-CV-05704 RSL

-12-

**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

1   solely address demand as of Q4 2016 in which Impinj reported a *then-record* quarterly revenue

2   of $33.7 million and *record* fiscal year revenue of $112.3 million (43% growth over Q4 2015).

3   Ex. 9 (4Q16 Call) at 3.  The remaining two demand-related statements on May 11, 2017 (¶ 143)

4   and August 14, 2017 (¶ 149) that "revenue increased . . . primarily driven by increased demand

5   for our endpoint ICs" are inactionable for the same reason.  As of May 11, 2017, Impinj reported

6   that revenue had increased by 47% in Q1 2017 year-over-year, exceeding Impinj's forecasts.  Ex.

7   10 (1Q17 Call) at 6; ¶ 74.  As of August 14, 2017, Impinj reported that Q2 2017 revenue reached

8   a *new record* of $34.1 million.  Ex. 11 (2Q17 Call) at 3.

9                    iii.   <u>Statements of "Strong" or "Increased" Demand Are Not Actionable</u>

10           Regardless, Defendants' statements of "strong," "increased," "accelerating" or "growing"

11   demand, ¶¶ 10, 73, 99, 113, 130, 143, 149, are not actionable as they are merely vague,

12   immaterial puffery.  *See Rosenzweig v. Azurix Corp*., 332 F.3d 854, 869 (5th Cir. 2003)

13   (statement "fundamentals are strong" too vague to be actionable); *In re Splash Tech. Holdings*

14   *Sec. Litig.*, 160 F. Supp. 2d 1059, 1076–77 (N.D. Cal. 2001) (statements about "strong" demand

15   and "robust" results too vague to be actionable).  This is particularly true since Defendants

16   disclosed that they had limited visibility into end-user deployments and therefore had significant

17   difficulty forecasting demand.  *See supra* at 3–4.

18           Plaintiff pleads no facts to explain why an alleged inability of Impinj's gateways to locate

19   items resulted in a purported decline in demand for endpoint ICs beginning in Q1 2017.  This

20   lack of specificity is confounding, especially since sales of gateways—the Impinj product that

21   *has* location capabilities—actually *increased* 42% in fiscal year 2017 as compared to fiscal year

22   2016, Ex. 3 (4Q17 Call) at 4, which itself saw an 11.2% increase over fiscal year 2015, Ex. 4

23   (FY16 10-K) at 60.  This year-over-year increase in gateway revenue is the exact *opposite* of

24   what one would have expected if gateways had a locationing problem.  By failing to specify the

25   connection between the alleged locationing problem and purported changes in endpoint IC

26   demand, Plaintiff fails to plead how statements made by Defendants about endpoint IC demand

27   during the class period were false or misleading when made.

**DEFENDANTS' MOTION TO DISMISS**
3:18-CV-05704 RSL
-13-
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

1                   iv.     <u>CW3 Does Not Support Falsity of Demand-Related Statements</u>

2          Since CW3 states that demand did not start to decline until Q1 2017, ¶¶ 11, 71, 76, he

3 contradicts any allegation that Defendants' statements concerning demand were false or

4 misleading before then.  While CW3 claims that sales staff from some point in Q1 2017 forward

5 reported that "demand" was "not as strong as represented" to the market, ¶ 71, he provides no

6 specific fact as to the difference between the reported and actual demand in any given quarter,

7 for which products demand was not increasing, or which customers did not purchase endpoint

8 ICs because of the alleged locationing issue.  *See Brodsky I*, 592 F. Supp. 2d at 1200 (rejecting

9 allegations lacking "objective indicators"); *Zucco*, 552 F.3d at 998; *Velti*, 2015 WL 5736589 at

10 *23; *Copper Mountain*, 311 F. Supp. 2d at 867–68.  CW3 claims that Mr. Brodersen directed

11 sales staff to "pull[] in" endpoint IC orders from future quarters to mask falling demand, ¶ 77,

12 but provides zero details as to the total unit or dollar volumes pulled in by the Company in any

13 quarter, what products were pulled in, from which customers they were pulled in, or whether the

14 pull ins violated accounting rules.  *See In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083–84

15 (8th Cir. 2005) (allegations of "pulling in" insufficient for failure to allege "the amount of any

16 overstatements, the extent of any pulling in that took place, or the amount of any revenue that

17 was pulled in").  CW3 also claims that the drop in demand for endpoint ICs in the second half of

18 2017 was unrelated to falling lead times, as Impinj had explained.  Yet the Complaint fails to

19 explain how CW3 could know this or why he believed the given explanation was untrue.  ¶¶ 76,

20 79 n.26, 165, 185; *see Zucco*, 552 F.3d at 996 (CW "supplie[d] no basis for his claim").

21 **III.     THE COMPLAINT FAILS TO ADEQUATELY PLEAD SCIENTER**

22          The PSLRA requires that a plaintiff plead with particularity that each defendant either

23 knew that a statement was false or misleading when made, or exhibited, at a minimum,

24 "deliberately reckless or conscious misconduct" as to its falsity.  *In re Silicon Graphics Sec.

25 Litig.*, 183 F.3d 970, 974–75 (9th Cir. 1999); *Zucco*, 552 F.3d at 991; *Lipton v. Pathogenesis

26 Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002).  "Recklessness" is "a highly unreasonable omission,

27 involving not merely simple, or even inexcusable negligence, but an extreme departure from the

**DEFENDANTS' MOTION TO DISMISS**
3:18-CV-05704 RSL
-14-
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

standards of ordinary care." *Silicon Graphics*, 183 F.3d at 976. In weighing the strength of scienter allegations, a court must engage in a holistic, comparative evaluation, considering not only "competing inferences rationally drawn from the facts alleged," but also any "plausible, nonculpable explanations" offered by defendants. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 322–24 (2007). The inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* If a complaint fails to meet these requirements, the PSLRA mandates that the court "shall . . . dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A). Plaintiff fails to satisfy this demanding burden.

### A.      Plaintiff Does Not Plead a Strong Inference of Scienter as to Locationing

Scienter must be pleaded with particularity as to each defendant separately. *See* 15 U.S.C. § 78u-4(b)(2)(A); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1157 (C.D. Cal. 2007) (court "analyze[s] scienter separately for each alleged misrepresentation and each defendant"); *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 752 (N.D. Cal. 1997) (plaintiffs must "distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud"). In conducting this defendant-by-defendant analysis, CWs have little relevance in evaluating whether a complaint pleads a strong inference of scienter unless they had "reliable personal knowledge" of each defendant's "mental state." *Zucco*, 552 F.3d at 998. Here, the CWs lack personal knowledge of the mental states of the Individual Defendants.

CW1 and CW2 did not report to, and allege very limited interactions with the Individual Defendants. ¶¶ 51, 62; *see Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (rejecting statements of CWs who "lack[ed] first[-]hand knowledge regarding what the individual defendants knew or did not know"); *Zucco*, 552 F.3d at 998 (same). CW1 left Impinj before the start of the class period and CW2 left just a few months into it. ¶¶ 51, 59, 65. Thus, they could not have been in a position to know the Individual Defendants' mental state

DEFENDANTS' MOTION TO DISMISS
3:18-CV-05704 RSL

-15-

WILSON SONSINI GOODRICH & ROSATI, P.C.
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

when they were not even working at the Company. *See supra* at 9. None of the three CWs claim to have met or spoken with Mr. Fein, let alone shared their alleged concerns about locationing with him. *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1117 (N.D. Cal. 2009) ("*Brodsky II*") (no scienter where CW did not "describe any personal contact with any of the Defendants").

While CW2 claims to have "regularly attended meetings" with Dr. Diorio and Mr. Brodersen, he does not allege he ever discussed his locationing concerns with them or otherwise provide any details as to those meetings. ¶ 62; *see supra* at 10. Though CW1 claims to have "talked with Brodersen" and "briefly previewed" his "concerns" to Dr. Diorio in a hallway, he fails to "recount[] the particulars" of either conversation. ¶¶ 57–58; *Zucco*, 552 F.3d at 998; *see Medicis Pharm.*, 689 F. Supp. 2d at 1210 (CW failed to specify when CW spoke to defendants or what was said); *supra* at 10. CW1 admits that the meeting he scheduled with Dr. Diorio to discuss his concerns never occurred. ¶¶ 8, 58. While CW1 claims he attended meetings with Dr. Diorio and Mr. Brodersen before the IPO in which locationing was discussed, he provides no details of these meetings ████████████████████████████████████████

████████████████████████████████████████████████████████

*see supra* at 10. Even if certain engineers held the opinions alleged in the Complaint, there is no indication that they shared such opinions with the Individual Defendants. ¶¶ 44–45, 47.

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ This is not enough. *See City of Marysville Gen. Emps. Ret. Sys. v. Nighthawk Radiology*, 2011 WL 4584778, at *22 (D. Idaho Sept. 12, 2011) (plaintiff must "specify actual details about Defendants' access to information within the company, and that they actually did access the information"). Regardless, CW2 left Impinj a few months into the class period and therefore ████████████████████████████████

**DEFENDANTS' MOTION TO DISMISS**
3:18-CV-05704 RSL
-16-
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

1

████████████████████

2      For all of the CW allegations concerning locationing—the meetings and ████████

3  untethered to any date or other details, ████  ████████████████████

4  ████████—the CWs are not in a position to know what the Individual Defendants learned or

5  the problems the Company solved thereafter.  *See Metawave II*, 629 F. Supp. 2d at 1217 (product

6  "test failures" did not bear on demand "six months later," in which time defendants may have

7  learned "different information"); *In re Remec Inc. Sec. Litig.*, 415 F. Supp. 2d 1106, 1118 (S.D.

8  Cal. 2006) (accounting violation ten months before class period "d[id] not support the claims

9  asserted during the Class Period").[2]

10        **B.**    **Plaintiff Does Not Plead a Strong Inference of Scienter as to Demand**

11      Plaintiff relies solely on CW3 for its allegations that Defendants' statements regarding

12  demand were false or misleading.  ¶¶ 160, 161, 165.  As noted, CW3's allegations that Mr.

13  Brodersen and Dr. Diorio learned of declining demand during meetings lack such details as when

14  they learned of this decline, how much the decline was in volume or dollars in any given quarter,

15  which customers were affected and to what degree, and what they understood to be the reason

16  for the decline.  ¶¶ 71–72, 76, 160.  This lack of detail defeats Plaintiff's claim.  These are

17  classically vague, insufficient allegations under the PSLRA.  *See supra* at 10–11.

18      While CW3 is not clear about much, the one thing he *is* clear about is that the decline in

19  demand began no earlier than Q1 2017.  ¶¶ 11, 71, 76.  It is not only plausible, but likely (and

20  consistent with his allegations) that the decline in demand was not apparent to CW3 or the

21  Individual Defendants until Q3 2017.  Impinj reported a *record* $33.7 million in revenue for Q4

22  2016.  ¶ 130.  While it reported a slight decline in revenue in Q1 2017, to $31.7 million, ¶ 74,

23  revenue rebounded in Q2 2017 to a *new record* of $34.1 million.  Ex. 11 (2Q17 Call) at 3.  On

24

---

25      [2] Plaintiff alleges that the terminations of CW1 and CW2 and alleged retaliation against CW3 support a strong inference of scienter.  ¶¶ 158–159.  Defendants' alleged response to each CW, however, undermines this assertion.

26  Not only did the Audit Committee investigate each CW's complaint, but the Company reported CW3's accusations to the SEC.  ¶¶ 59, 64, 83.  These are not the actions of a company trying to sweep whistleblowers under the rug.

27  *See In re SCB Computer Tech., Inc.*, 149 F. Supp. 2d 334, 342, 365 (W.D. Tenn. 2001) (company's disclosure of a government investigation "tends to negate an inference" that the investigation's existence suggests scienter).

**DEFENDANTS' MOTION TO DISMISS**
3:18-CV-05704 RSL

-17-

**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

August 3, 2017, midway through Q3, Impinj disclosed that it saw slowing demand due to delayed end-user expansions that quarter and thus was lowering its fiscal year 2017 endpoint IC volume guidance from a range of 7.8–8.0 billion units to a range of 7.0–7.2 billion units. ¶ 173. Impinj disclosed the decline in the very quarter it learned of it. Thereafter, it reported further declines in revenue to $32.6 million for Q3 2017, ¶ 175, and $26.9 million for Q4 2017, ¶ 182, and disclosed what it was learning—that demand was also declining due to customers drawing down on their own inventory of Impinj product as they transitioned to a new commercial environment in which Impinj had its own buffer stock and shorter lead times. *See supra* at 5.

While CW3 claims this revenue would have been far worse had it not been for Mr. Brodersen allegedly "pulling in" revenue, CW3 provides no details as to the total unit or dollar volumes pulled in by the Company in any quarter, what products were pulled, from which customers they were pulled in, or whether these pull ins violated accounting rules. *See Cerner*, 425 F.3d at 1083–84. Assuming these "pull ins" were taking place and were improper (two big assumptions), the Complaint pleads no particularized facts that Diorio or Fein were aware of it.

**C.**  ███████████████████████████████████████
███████████████████████████████████████

The CWs allege that they reported their concerns to the Company's Audit Committee or a government agency, but these allegations also lack particularity. CW1 and CW2 claim that they reported their concerns to Impinj's Audit Committee and ████████████████████ ████████████████████████ but do not provide any details of their reports or ██████████ ████████████████ and certainly do not allege that they mentioned locationing or declining demand. ¶¶ 9, 59, 64, 155. What is alleged, however, is that the Audit Committee commenced an investigation that did not result in modifying the IPO registration statement. *Id*. CW3 claims he reported Impinj's "untoward practices" to OSHA, which prompted another Audit Committee investigation, but does not elaborate on what he reported, and certainly does not claim that he mentioned locationing or declining demand. ¶¶ 11, 83, 156. The Complaint does state, however, that the Audit Committee investigated his allegations. *Id*. Indeed, Impinj

reported that the Audit Committee "retained independent counsel to oversee a thorough and careful investigation of the claims and the independent investigation did not uncover any credible evidence supporting them." Ex. 17 (2Q18 10-Q) at 18. While the Complaint admits that Impinj disclosed CW3's allegations to the SEC Staff, ¶¶ 11, 83, it does not allege that the Staff investigated his claims or, after investigating them, took any action. Regardless, the lack of specifics as to the contents of these reports or complaint precludes any reliance on them in evaluating the CW's allegations. *Zucco*, 552 F.3d at 998 (rejecting CW statements that failed to "recount[] the particulars" of their allegations); *Medicis*, 689 F. Supp. 2d at 1210 (rejecting CW allegations without "details about the content of those conversations.").

### D.  No Other Facts Alleged Give Rise to a Strong Inference of Scienter

####   i.   Generic Motive Allegations Do Not Support an Inference of Scienter

Defendants' motive to "complete their long-desired IPO," ¶ 168, is a "routine business objective[]" shared by all companies that, "'without more,'" does not support scienter. *Zucco*, 552 F.3d at 1006; *Webb v. SolarCity Corp.,* 884 F.3d 844, 856 (9th Cir. 2018). As for the challenged stock sales, ¶¶ 32, 168, Plaintiff must allege facts showing that the sales are unusual or "suspicious" in timing, the amount and percentage of shares sold, and that they are "'dramatically out of line with prior trading practices.'" *Metzler*, 540 F.3d at 1066–67; *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017). With the exception of the timing of Dr. Diorio's sales, the Complaint omits all three. The stock sales therefore cannot support any inference of scienter, let alone a strong one. *Id.* at 622; *see Zucco*, 552 F.3d at 1005–06.

####   ii.   Defendants' Roles and Responsibilities Do Not Support Scienter

Plaintiff's laundry list of ways in which the Individual Defendants were "directly and extensively involved in developing the Impinj Platform and carrying the day-to-day operations of the Company," ¶ 170, lacks "detailed and specific allegations about [Defendants'] exposure" to the facts Plaintiff alleges make their statements false or misleading. *Zucco*, 552 F.3d at 1000. The Complaint therefore cannot establish that Defendants must have learned these facts via their

"role[s] in the company." *Id.* at 1000–01; *see Curry v. Yelp Inc.*, 875 F.3d 1219, 1227 (9th Cir. 2017) (awareness of day-to-day operations does not establish scienter).

### iii.   Impinj's Internal Control Weaknesses Do Not Support Scienter

Impinj's disclosures of a material weakness in internal controls in every quarterly report, ¶ 166, *negates* an inference that Defendants acted with scienter. *See Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*, 576 F.3d 172, 189 (4th Cir. 2009) (disclosure of "internal control deficiencies" supported inference "that defendants were not acting with scienter but rather were endeavoring in good faith to inform investors of their internal control and financial reporting problems"). Besides, the disclosed class period control weakness related to complex accounting matters like the Company's 2012 recapitalization and its impact on earnings per share or the Company's 2015 presentation of lease incentives in its cash flow statements. Ex. 2 (S-1) at 35. It had nothing to do with locationing or endpoint IC demand.

### iv.   The Departure of Impinj's CFO Does Not Support Scienter

Without alleging something "suspicious" about Mr. Fein's departure that could connect it to fraudulent activity, the only inference to be drawn is that Mr. Fein left Impinj for the reasons he gave—"to spend more time with family and to pursue other opportunities." Ex. 13 (2/1/18 8-K) at 4; *Zucco*, 552 F.3d. at 1002. That Mr. Fein took a position at another company, ¶ 180 n.33, supports rather than contradicts his statement. Ex. 13 at 4.

### E.   Viewed Holistically, the Non-Culpable Inference is More Compelling

Plaintiff's suggested scienter inference is not cogent, compelling, or as plausible as a competing non-culpable inference. *Tellabs*, 551 U.S. at 324. Plaintiff alleges that locationing, a basic or core feature of the Impinj Platform, never worked before, and did not work during, the purported class period. But Plaintiff cannot cogently explain why customers nonetheless bought and continued to buy billions of Impinj's endpoint ICs before and during the class period, including 7 billion units in 2017 alone. While Plaintiff points to a decline in demand for Impinj's endpoint ICs that began no earlier than Q1 2017, such a slight decline is too small for a Platform that allegedly never provided one of its three core features. If this decline in demand

DEFENDANTS' MOTION TO DISMISS
3:18-CV-05704 RSL
-20-
WILSON SONSINI GOODRICH & ROSATI, P.C.
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

was due to poor locationing, as Plaintiff alleges, then one would expect that sales of the products within the Platform designed to perform locationing—gateways—would dry up completely.  The opposite was true.  At the same time demand for Impinj's endpoint ICs declined, sales of its readers and gateways skyrocketed to the point that Impinj could not keep up with demand.  *See supra* at 5.  Relying upon a purposefully simplistic claim that a locationing problem existed throughout the Impinj Platform, Plaintiff ignores the fact that the Company's gateways did provide locationing, ████████████████████████████████████████████

████████████████████████████████  ████████████████████████████████

██████████████████████ Impinj's fledgling software operating system.

The far more plausible inference is that the non-engineer CWs, one of whom worked exclusively on software and another who worked in sales, raised or heard concerns about Impinj's location function (possibly solely related to software), but those concerns were evaluated by qualified individuals and rejected as ill-informed or outdated.  While the Company was working to improve the locationing feature in several of its products, including ItemSense, it provided satisfactory locationing through its gateways. ████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████ The decline in endpoint IC demand occurred when Impinj disclosed it to the market and for the reasons the Company provided, not because customers were only then realizing in mid-2017 that the Company's products did not provide locationing.

## IV.    THE COMPLAINT DOES NOT PLEAD LOSS CAUSATION AS TO LOCATION

To plead and prove loss causation, a plaintiff must show "that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). The legislative history of the PSLRA describes the loss causation requirement as a "strong" one.  S. Rep. No. 104-98, at 15 (1995).  In *Halliburton*, the Supreme Court stated that the PSLRA's loss causation provision requires showing "a misrepresentation that affected the integrity of the market price" and "caused [the] subsequent economic loss."  563 U.S. at 812. The loss causation requirement ensures that a defendant is held responsible only for "economic

1   losses that misrepresentations actually cause," rather than being forced "to provide investors with

2   broad insurance against market losses." *Dura*, 544 U.S. at 345.

3        In the Ninth Circuit, two standards for pleading loss causation have emerged.  The first,

4   more restrictive test requires a plaintiff to "allege that the practices that the plaintiff contends are

5   fraudulent were revealed to the market and caused the resulting losses." *Metzler*, 540 F.3d at

6   1063–64 (affirming dismissal of section 10(b) case for failure to plead loss causation, noting

7   plaintiff cannot "plead loss causation through 'euphemism' and thereby avoid alleging the

8   necessary connection between defendant's fraud and the actual loss"); *Or. Pub. Emps. Ret. Fund

9   v. Apollo Grp.*, 774 F.3d 598, 608 (9th Cir. 2014) (affirming dismissal on loss causation grounds

10  because plaintiffs did "not allege specific statements made by the Defendants that were made

11  untrue or called into question by subsequent public disclosures"); *In re Oracle Corp. Sec. Litig.*,

12  627 F.3d 376, 392 (9th Cir. 2010) (to establish loss causation "the market must learn of and react

13  to those particular practices themselves").  The second, more lenient test requires "a 'causal

14  connection' between the fraud and the loss, by tracing the loss back to 'the very facts about

15  which the defendants lied.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750,

16  752–53 (9th Cir. 2018) (citation omitted).[3]  While Defendants believe the restrictive test is more

17  established in the Ninth Circuit and correct, the Complaint fails to satisfy either test.

18       Plaintiff alleges that Defendants claimed that the Platform provided locationing when it

19  could not.  *See supra* at 7–12; ¶¶ 86, 89, 92, 96, 103, 106, 110, 115, 118, 121, 124, 127, 131,

20  134, 137, 140, 146.  Yet Plaintiff's purported class period does not end with the "truth" being

21  revealed that the Platform could not provide this function; indeed, it fails to allege that such a

22  disclosure was *ever* made.  Instead, the class period ends with a series of statements on August 3

23  and November 1, 2017, and February 1 and 15, 2018 disclosing declining revenue and customer

24  demand for endpoint ICs, *see supra* at 5; ¶ 79.  This highlights the incompatible nature of

25  Plaintiff's two-step loss causation argument: that disclosure of declining demand for Impinj's

26  ────────

27  [3] On August 6, 2018, a petition for certiorari in *First Solar* was filed with the U.S. Supreme Court.  It has been fully briefed by the parties and *amici curiae*.  On October 9, 2018, the Court invited the Solicitor General to file a brief.  https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/18-164.html.

endpoint ICs somehow revealed that its Platform did not provide locationing.   ¶¶ 172–188.

Under the more restrictive Ninth Circuit test, declining demand cannot serve as a "euphemism" or proxy for a revelation that the Company's Platform does not have a working location feature.  The Ninth Circuit's decision in *Oracle* is instructive.  In *Oracle*, the plaintiffs alleged that defendants misrepresented the quality and success of its Suite 11i product while hiding that it was full of defects.  627 F.3d at 392–93.  The plaintiffs asserted that the class period ended with Oracle's disclosure of an earnings miss.  *Id*.  Attempting to show loss causation, the plaintiffs argued that the cause of this earnings miss was a decline in customer demand for Oracle's products and that this decline in demand was due to defects in Suite 11i.  *Id*. at 393.  The district court disagreed and the Ninth Circuit affirmed, holding that "the market did not learn . . . that customers did not buy Suite 11i as a result of defects." *Id*.

The Complaint also fails the more lenient Ninth Circuit test, for its failure to trace the loss back to the "facts about which the defendant[s] lied," *i.e.*, that the Platform provided locationing.  *First Solar*, 881 F.3d at 753.  As shown above, the Complaint provides no plausible factual connection between the alleged absence of a working location feature and the decline in demand for Impinj's endpoint ICs.  It only provides a conclusory, unsupported, contradicted, and implausible allegation that there was some connection.  *See supra* at 13, 20–21.[4]

## V.   THE COMPLAINT FAILS TO STATE A CLAIM AGAINST MR. BRODERSEN

The Complaint does not allege that Mr. Brodersen made any false or misleading

---

[4] Plaintiff contends that an analyst's report following the November 1, 2017 earnings call stating "large retailers [were] finding it difficult to implement the RAIN RFID technology" shows that analysts "immediately connected the November 1, 2017 disclosures with potential functionality issues in Impinj's platform."   ¶ 176; Ex. 18 (Nov. 2, 2017 Piper Jaffray Report) at 1.  Not so.  Potential implementation difficulties are myriad, including the integration of the Platform into an end-user's existing hardware, systems, and process.  There is no indication in the report that these difficulties were due to locationing.  In fact, the report actually says that the drop in endpoint IC volume was due "mainly to increased competition in the market for endpoint ICs."  *Id* at 1.  The report notes, "[o]n the positive side," that "fixed-reader sales were strong in Q3, with unit volumes up 68% y/y, and we believe Impinj will keep the fixed-readers as a near-term growth focus."  *Id*.  It also points out that Impinj's Speedway R120 reader and xSpan gateway "both sold out during Q3."  *Id*. at 2.  If the analyst believed that a core feature of Impinj's products did not work, the report would not have projected sequential revenue increases for 2017, 2018, and 2019.  *Id*. at 5.  In other words, the analyst Plaintiff relies on to have "immediately connected" the drop in demand to locationing issues actually wrote that the drop in demand was due to increased competition from other endpoint IC providers and delayed endpoint IC orders, and that the only "positive" was fixed-reader sales, the Impinj product line that includes location offerings.  *Id*.  The report does not strengthen the Complaint's loss causation claim, it dooms it.

**DEFENDANTS' MOTION TO DISMISS**
3:18-CV-05704 RSL

-23-

**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500

1  statements.  He is not alleged to have signed the Company's IPO or SPO registration statements,

2  ¶¶ 86, 114, or any of the Company's other SEC filings in which Plaintiff alleges a misstatement,

3  ¶¶ 92, 96, 103, 110, 124, 131, 134, 140, 146.  He is not alleged to have uttered a false or

4  misleading statement on any of the Company's quarterly earnings calls, investor presentations, or

5  video presentation, ¶¶ 95, 106, 118, 121, 127, 137.  And he is not alleged to have authored the

6  two reports posted on Impinj's website, ¶¶ 89, 100.  Where a "complaint contains no specific

7  factual allegations to link [a particular defendant] to any of the allegedly false statements," the

8  complaint should be dismissed as to that defendant.  *In re Impac Mortg. Holdings, Inc. Sec.*

9  *Litig.*, 554 F. Supp. 2d 1083, 1093 (C.D. Cal. 2008).  While the Complaint alleges that Mr.

10  Brodersen was "involved in drafting, reviewing, publishing, . . . making" or "approv[ing]" the

11  challenged statements, ¶¶ 22, 24, Plaintiff does not plead any *specific* facts that link Brodersen to

12  them, as required, and the Complaint is silent as to how COO Brodersen had "ultimate authority"

13  over statements made by the CEO and CFO.  *See Janus Capital Grp. v. First Deriv. Traders*, 564

14  U.S. 135, 142–43 (2011).  This Court should dismiss the claims against Mr. Brodersen.

15  **VI.    THE COMPLAINT FAILS TO STATE A SECTION 20(a) CLAIM**

16  As a Section 20(a) claim is predicated on an underlying primary violation and the

17  Complaint fails to allege such a violation, the Section 20(a) claim should be dismissed.  *See*

18  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002), 15 U.S.C. § 78t.

19                                  **CONCLUSION**

20  The Complaint fails to state a claim as to falsity, scienter, and loss causation.  The

21  Complaint should be dismissed.

22  Dated:  March 19, 2019

s/ Barry M. Kaplan
Barry M. Kaplan, WSBA #8661
Gregory L. Watts, WSBA #43995
Stephanie L. Jensen, WSBA #42042
Christopher M.E. Petroni, WSBA #46966
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036

Telephone:  (206) 883-2500
Facsimile:   (206) 883-2699
Email: bkaplan@wsgr.com
Email: gwatts@wsgr.com
Email:  sjensen@wsgr.com
Email:  cpetroni@wsgr.com

*Attorneys for Defendants Impinj, Inc., Chris Diorio,*
*Evan Fein, and Eric Brodersen*