1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

The Honorable Robert S. Lasnik

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

IN RE IMPINJ, INC. SECURITIES
LITIGATION

No. 3:18-CV-05704-RSL

CLASS ACTION

**[REDACTED] LEAD PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS CONSOLIDATED CLASS
ACTION COMPLAINT**

NOTE ON MOTION CALENDAR:
May 3, 2019

ORAL ARGUMENT REQUESTED

**REDACTED VERSION PURSUANT TO LCR 5(g)(3)**

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS
3:18-CV-05704-RSL

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

1

## TABLE OF CONTENTS

2

Page

3 TABLE OF AUTHORITIES ............................................................................................ ii

4 TABLE OF ABBREVIATIONS .....................................................................................v

5 I.    INTRODUCTION ............................................................................................... 1

6 II.   SUMMARY OF FACTS ..................................................................................... 2

7 III.  ARGUMENT ....................................................................................................... 7

8      A.   The Complaint Amply Alleges Misleading Statements And
            Omissions About The Platform's "Location" Capability ....................... 7

9
            1.   Defendants' Attempt To [Redacted]
10               Fails.......................................................................................... 9

11          2.   Defendants Fail to Discredit the Former Impinj Executives'
                 Accounts ................................................................................. 11

12
       B.   The Complaint Amply Alleges Misleading Statements And
13          Omissions Attributing Increased Revenues to Increased Demand ....... 14

14     C.   The Complaint Raises A Strong Inference Of Scienter ......................... 16

15          1.   Defendants' Alternative "Explanation" Based On
                 Manufactured Facts Outside The Complaint Cannot Be
16               Credited.................................................................................. 21

17     D.   The Complaint Adequately Alleges Loss Causation ............................ 22

18     E.   The Complaint States A Claim Against Defendant Brodersen ........... 24

19 IV.  CONCLUSION................................................................................................... 24

20

21

22

23

24

25

26

27

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS
Case No. 3:18-cv-05704-RSL                        -i-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>                                                                        <u>**Page**</u>

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008)...................................................20

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...........................................................7, 9, 12, 14

*In re BofI Holding, Inc. Sec. Litig.*,
2016 WL 5390533 (S.D. Cal. Sept. 27, 2016)................................................15

*In re BofI Holding, Inc. Sec. Litig.*,
2017 WL 2257980 (S.D. Cal. May 23, 2017).......................................2, 10, 11, 24

*In re Cannavest Corp. Sec. Litig.*,
307 F. Supp. 3d 222 (S.D.N.Y. 2018)...........................................................20

*Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*,
793 F. Supp. 2d 1138 (C.D. Cal. 2011) .........................................................23

*In re Cerner Corp. Sec. Litig.*,
425 F.3d 1079 (2005)..................................................................................16

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ....................................................................12

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................22, 23

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) .........................................................................9

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ..................................................................7, 23

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) .........................................................................7

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) .....................................................................20

*Iowa Pub. Emps.' Ret. System v. MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010)........................................................................10

*In re Juno Therapeutics, Inc.*,
2017 WL 2574009 (W.D. Wash. June 14, 2017)...............................................9

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS
Case No. 3:18-cv-05704-RSL                    -ii-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ..................................................................... passim

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...................................................18

*McGuire v. Dendreon Corp.*,
    2008 WL 5130042 (W.D. Wash. Dec. 5, 2008) .......................................22

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ..................................................................... passim

*Murphy v. Precision Castparts Corp.*,
    2017 WL 3084274 (D. Or. June 27, 2017), Report and Recommendation
    *adopted by* 2017 WL 3610523 (D. Or. Aug. 22, 2017)......................14, 16

*N. Mex. State Inv. Council v. Ernst & Young*,
    620 F.3d 137 (2d Cir. 2010)......................................................................21

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    641 F. 3d 1089 (9th Cir. 2011) ..................................................................7

*In re Peoplesoft, Inc. Sec. Litig.*,
    2000 WL 1737936 (N.D. Cal. May 25, 2000) ..........................................18

*Police and Fire Ret. Sys. of the City of Detroit v. Crane*,
    87 F. Supp. 3d 1075 (N.D. Cal. 2015) .................................................15, 18

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ...........................................................7, 13, 16

*In re Questcor Sec. Litig.*,
    2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) .............................................15

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) .....................................................................19

*Robb v. Fitbit Inc.*,
    2017 WL 219673 (N.D. Cal. Jan. 19, 2017).......................................19, 20, 22

*Robb v. Fitbit Inc.*,
    216 F. Supp. 3d 1017 (N.D. Cal. 2016) .....................................................19

*S. Ferry LP #2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)..................................................20

*S.E.C. v. Pocklington*,
    2018 WL 6843665 (C.D. Cal. Nov. 29, 2018)...........................................24

Lead Plaintiff's Opp. to Motion to Dismiss
Case No. 3:18-cv-05704-RSL                          -iii-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

*Schueneman v. Arena Pharm., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ..............................................................7, 8, 16, 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................17, 20, 21

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ...........................................13

*In re Toyota Motor Corp. Sec. Litig.*,
    2012 WL 3791716 (C.D. Cal. Mar. 12, 2012).............................................10

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ........................................................14

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ................................................................18, 20

*In re Vocera Commc'ns, Inc. Sec. Litig.*,
    2015 WL 603208 (N.D. Cal. Feb. 11, 2015) ...............................................19

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*,
    2017 WL 3058563 (N.D. Cal. July 19, 2017)..............................................24

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) ........................................................17

**STATUTES AND RULES**

Federal Rules of Civil Procedure
    Rule 15...................................................................................................24

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS
Case No. 3:18-cv-05704-RSL     -iv-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

1

## TABLE OF ABBREVIATIONS

| ¶__ | Paragraph of the Complaint |
|---|---|
| Class Period | July 21, 2016 through February 15, 2018 |
| Complaint | Consolidated Class Action Complaint, ECF No. 35 |
| Defendants | Impinj, Inc.; Chris Diorio; Evan Fein; and Eric Brodersen |
| Director of Product 1 | Impinj's former Senior Director, Product Management & Marketing, who is more fully described at ¶51 of the Complaint |
| Director of Product 2 | Former Senior Director of Product Management at Impinj, who is more fully described at ¶62 of the Complaint |
| Executive Defendants | Chris Diorio; Evan Fein; and Eric Brodersen |
| IPO | Initial public offering |
| Lead Plaintiff | Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge |
| Mot. | Defendants' Motion to Dismiss the Consolidated Class Action Complaint, ECF No. 42 |
| Registration Statement | Impinj's Registration Statement filed with the SEC on Form S-1 on July 21, 2016 at the start of the Class Period |
| VP of Sales | Vice President of Sales, Strategic Markets, who is more fully described at ¶¶68-70 of the Complaint |
| Watts Declaration | March 19, 2019 Declaration of Gregory L. Watts submitted by Defendants in connection with their motion to dismiss (ECF No. 43) |

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS
Case No. 3:18-cv-05704-RSL                    -v-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

# I.    <u>INTRODUCTION</u>

This case concerns Defendants' false and misleading statements about Impinj's product platform. In the Registration Statement used to take Impinj public and in quarterly SEC filings, Defendants represented that the Impinj Platform delivers the unique location of tagged items, singling out that capability as one of the product's core competencies. Defendants' representations caused Impinj's stock price to soar by nearly 300% in a matter of months.

The Complaint details how, in truth, ████████ Redacted ████████ ████████ Redacted ████████, a capability that Defendants repeatedly represented to investors it already had. ████████ Redacted ████████ ████████ Redacted ████████ ████████ Redacted ████████ ████████ Redacted ████████ The Complaint features additional ████████ Redacted ████████, as well as accounts from former product directors detailing both that the Platform was unable to deliver accurate location information and their unsuccessful efforts to prevent Defendants from misleading investors. It also includes the account of Impinj's former sales VP confirming that the Platform's inability to locate tagged items negatively impacted demand and caused Impinj to manipulate revenue recognition to temporarily mask that impact. Finally, the Complaint explains how the Company ultimately was forced to disclose decreased demand and revenues, causing the Company's stock price to decline dramatically and investors to lose over $669 million in shareholder value.

Defendants attack these detailed allegations with specious arguments founded on their own counter-narrative improperly injected under the guise of the "incorporation-by-reference" doctrine. The Ninth Circuit recently rejected that precise tactic in *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) ("*Orexigen*"), which held that "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." Flaunting *Orexigen's* proscriptions, Defendants concoct a series of fact-intensive challenges that are both baseless and improper.

For example, Defendants assert that Diorio's statements to investors touting the Platform's ability to locate tagged items were somehow *consistent* with [Redacted] [Redacted] They are not. In "tout[ing] positive information to the market" about the Platform's location capability, Diorio was required, but failed, to "disclos[e] adverse information that cuts against the positive information" (*Orexigen*, 899 F.3d at 1009), [Redacted] [Redacted]

Defendants also attempt to refute the Complaint's well-pled allegations with speculation that it is *possible* that Impinj somehow managed to fix the Platform's locationing problems between [Redacted] and the IPO months later. But Defendants blink past the accounts of the former Directors of Product (one of whom was at Impinj on *the eve* of the IPO and the other *after* the IPO) and the VP of Sales (who was at Impinj during the *entire* misstatement period). They also ignore that [Redacted] [Redacted] [Redacted] [Redacted] They further ignore the many judicial decisions finding that the fact an admission "occurred before the class period does *not* strip the allegation of its probative value." *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *11 (S.D. Cal. May 23, 2017).

Finally, Defendants resort to a disfavored "loss causation" challenge that ignores both the pleading standards for loss causation and the Ninth Circuit's controlling decision in *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) ("*First Solar*"), which disposes of their argument.

## II. <u>SUMMARY OF FACTS</u>

Impinj was founded in 2000 with financing from venture capital and private equity firms intent on taking the Company public. ¶¶27-28. The Company has one product platform, the Impinj Platform, which it claimed enabled users to digitally authenticate, locate, and identify "tagged" items. The Platform consists of (i) "endpoint ICs" affixed to items, (ii) "gateways" that wirelessly communicate with the endpoint ICs, and (iii) "ItemSense" software. ¶25. Impinj

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS
Case No. 3:18-cv-05704-RSL
-2-
BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

refers to the data collected as "Item Intelligence." ¶26.

In April 2011, the Company announced a planned initial public offering ("IPO"). ¶28. The effort failed spectacularly when analysts panned the Company's "mixed financial performance," noting that its technology "didn't break into mainstream use very quickly." ¶29.

Unhappy with that outcome, Impinj's financiers replaced the Company's long-time CEO with Diorio. ¶30. They then tried again to take the Company public, buoyed by radiant descriptions of the Company's supposedly industry-leading technology. ¶31. The Registration Statement accompanying the offering represented that the Impinj Platform "enables wireless connectivity to billions of everyday items" and delivers each item's "unique … location" to commercial and consumer applications. ¶33. It further touted how Impinj gateways were capable of "locating more than 1000 items per second," and claimed that Impinj was the only company selling a platform with those unique capabilities. *Id.*

Defendants' efforts to hype the Impinj Platform worked. The Company raised over $185 million through the IPO and a follow-on offering five months later. ¶¶31-32. They continued to tout the Impinj Platform after the offerings, repeatedly highlighting in press releases and quarterly SEC filings that their Platform wirelessly delivered the "unique location" of tagged items "to the digital world." ¶34. Defendants further claimed that the Platform's capability to identify the "unique location" of items was what distinguished Impinj from competitors and allowed the Company to tap into valuable new markets. ¶¶35-37. Analysts repeatedly cited the Platform's purported capability to provide real-time location of tagged items as a catalyst for future growth. ¶39. Impinj's stock price soared on the back of these reports, rising more than 300% in less than a year after the Company's IPO. ¶40.

Unfortunately for investors, that meteoric rise was fueled by misrepresentations. While the Company was continually plugging the Impinj Platform's supposed ability to provide the unique location of tagged items, the facts pled in the Complaint show that Defendants knew that the Platform was incapable of doing so. ¶¶41-78.

Redacted

1  Redacted

2  Redacted

3  Redacted

4  Redacted

5  Redacted

6  Redacted

7  Redacted

8  Redacted

9  Redacted [1]

10   Former Impinj executives have confirmed that Diorio and other Impinj executives knew

11  about the locationing problem.  Director of Product 1 explained that he attended several meetings

12  with Diorio and other senior executives during which the Platform's inability to accurately locate

13  tagged items was openly discussed. ¶45. During one such meeting, Redacted

14  Redacted

15  Redacted

16   Director of Product 2 similarly explained that Redacted

17  Redacted

18  Redacted

19  Redacted

20  Redacted

21  Redacted Impinj's VP

22  of Sales likewise confirmed that Impinj executives, including Defendants Diorio and Brodersen,

23  knew about the Impinj Platform's inability to accurately locate tagged items, which was

24  discussed during sales and business review meetings throughout the Class Period. ¶¶46, 72.

25   Meanwhile, Impinj's ability to enter new markets – including for use in hospitals, the

26  military, at Redacted and supply chain management – depended on its Platform's ability to

27

---

[1] Emphasis is added and internal citations are omitted unless otherwise noted.

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

accurately locate tagged items. ¶48. The Platform, however, lacked the necessary location feature.  For example, Director of Product 2 described how, if an IC endpoint tag were attached to a defibrillator in a patient's room, Impinj's Platform could not locate it within three patient rooms, which could ultimately cost a life. *Id.*

Director of Product 2 also Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted And VP of Sales confirmed that the Platform's inability to locate tagged items was a problem discussed throughout the Class Period until his departure from Impinj at the start of 2018. ¶¶46, 72.

Given these ongoing problems, Directors of Product 1 and 2 both concluded that the Company's statements to investors falsely represented the Platform's ability to deliver an item's unique location. ¶¶53-55, 63-64. Director of Product 1 explained that he was so uncomfortable with the Company's statements that he insisted through counsel that his name not be included on slide decks used during investor road shows. ¶56.  He described the Company's representations, including that the Platform could determine the location of an item within a certain number of feet, as "absolutely untrue," as verified by the Company's testing. ¶55.

Director of Product 1 raised his concerns to Brodersen before the IPO, emphatically telling him that location does not work and cannot be included in the Registration Statement. ¶57. When Brodersen failed to address his concerns, he scheduled a meeting with Diorio.  That meeting never occurred.  ¶58. Instead, after previewing his concerns to Diorio during a chance

encounter the morning of the meeting, Director of Product 1 was summoned into his manager's office later that day and unceremoniously fired. *Id.* Director of Product 2 likewise was retaliated against and eventually fired after raising his own concerns following the IPO over the veracity of Impinj's representations about the Platform's ability to accurately locate tagged items. ¶¶64-65.

The Platform's inability to locate tagged items eventually caught up with the Company. Beginning in the first quarter of 2017, Impinj's sales team identified a decline in customer demand for the Company's products, including IC endpoints. ¶71. That decline, which persisted throughout 2017, was driven by the Platform's inability to accurately locate tagged items. ¶¶66-78. After all, location capability was a ▮Redacted▮ of the Platform and one of the key value-adds purportedly distinguishing Impinj from its competitors. ¶¶42, 66. Without that capability, demand was bound to suffer, which is exactly what happened throughout 2017 as Impinj executives continued to discuss the Platform's inability to locate tagged items. ¶72.

Rather than come clean about the Company's locationing problem and the negative impact it was having on demand, Defendants doubled down, telling investors that quarterly demand was "growing" and was the "primary driver" of the Company's revenue growth. ¶¶73-74. Inside Impinj, however, executives specifically warned Brodersen and others that demand had *declined* each quarter in 2017.  ¶¶75-76. To mask this decline, Defendants resorted to deceptive sales-recognition practices.  At each quarter's end in 2017, Brodersen pressured Impinj sales executives to pull sales from future quarters and years into the current quarter. ¶77.  In some cases, 20% of a customer's future orders was pulled into the current quarter, while in other cases an even higher percentage. *Id.* While these practices allowed Impinj to continually report record revenues and sales, they were not sustainable.

Accordingly, on August 3, 2017, the Company announced that it expected to ship 10% fewer Platform endpoint ICs than previously announced. ¶79. The Company later admitted that the reduced Platform IC demand resulted in lower sales and negative revenue growth.  *Id.* The Company also was forced to admit that its long-standing "material weakness" in internal controls over financial reporting continued to exist and announced the "resignation" of long-time CFO

1  Fein, which market commentators identified as a further "alarm signal for investors."  ¶¶81-82.

2     Following the revelations of reduced revenues and demand, Impinj's stock price declined

3  over 80% from its Class Period high, erasing over $660 million in shareholder value and causing

4  Lead Plaintiff and members of the Class to suffer substantial losses.  ¶80.

5  ## III.   ARGUMENT

6     Courts evaluating motions to dismiss must "take all allegations of material fact as true and

7  construe them in the light most favorable to the nonmoving party." *In re Quality Sys., Inc. Sec.*

8  *Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). "A complaint should not be dismissed unless it

9  appears beyond doubt that the plaintiff cannot prove any set of facts that would entitle him or her

10  to relief."  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1229 (9th

11  Cir. 2004).  A district court ruling on a motion to dismiss is "not sitting as a trier of fact," and "so

12  long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's

13  skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536

14  F.3d 1049, 1057 (9th Cir. 2008) (reversing dismissal).

15     ### A.    The Complaint Amply Alleges Misleading Statements
       ### And Omissions About The Platform's "Location" Capability

16

17     A statement is false or misleading "if it would give a reasonable investor the impression of

18  a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied*

19  *Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  "Even if a statement is not false, it may be

20  misleading if it omits material information." *Orexigen*, 899 F.3d at 1009.  Once defendants

21  choose to "tout positive information to the market, they are bound to do so in a manner that

22  wouldn't mislead investors, including by disclosing adverse information that cuts against the

23  positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016); *see*

24  *also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992) (holding that defendant's

25  statements "touting its SI 480 printer when it was aware the printer had severe technological

26  problems" were misleading and actionable).

27     Here, Defendants represented in Impinj's Registration Statement, SEC filings and press

releases that the "[t]he Impinj Platform enables wireless connectivity to billions of everyday items

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS          -7-
Case No. 3:18-cv-05704-RSL

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

and delivers each item's *unique ... location*." ¶¶86, 92, 96, 103, 110, 115, 124, 131, 134, 140, 146.   In calls with investors, Defendants emphasized how, for the billions of items that it connects, the Platform was "delivering to the digital world each item's *unique ... location*." ¶¶106, 121, 127, 137.   And during investor presentations, Defendants again highlighted how the Platform "endow[s] each and every item with a digital representation that includes the item's *unique ... location*, and delivers that … *location*" to consumer and business applications.   ¶118.

These statements were false or, at minimum, misleading, because the Impinj Platform was incapable of delivering an item's "unique location" and could not accurately "locate" tagged items. Under Ninth Circuit law, once Defendants chose to "tout positive information to the market" about the Platform's location capabilities, they were duty-bound, but failed here, to disclose the "adverse information that cuts against the positive information" (*Schueneman*, 840 F.3d at 706), including: (i) Redacted

Redacted

Redacted

Redacted (ii) other Impinj executives and employees, Redacted

Redacted senior product managers, and Redacted

Redacted (¶¶44, 47);

(iii) Redacted

Redacted and (iv) Impinj's own senior product directors found misleading the Company's representations about the Platform's location capabilities (¶¶53-55, 63-64).

Faced with these detailed allegations, Defendants first argue (Mot. at 7) that the term "location" is so "vague" that they should not be held accountable for their repeated misrepresentations to investors that the Impinj Platform delivers the "unique location" of tagged items.   But there is nothing "vague" about Defendants' representations, and they certainly never told investors that their repeated representations were "too vague" to be trusted.   Indeed, Defendants made repeated and unqualified assurances that the Impinj Platform delivered tagged items' "unique location" – never once telling investors that the Platform actually suffered from

-8-

1   [Redacted]   As used in the Complaint and in

2   [Redacted]

3   [Redacted] – which the Defendants knew the Impinj Platform could not deliver. ¶42

4   [Redacted] ¶¶48-49 ([Redacted]

5   [Redacted]).  Defendants' contentions otherwise not only ignore the well-pled

6   allegations, but also the admonition in the Ninth Circuit that "whether a statement is misleading

7   and whether adverse facts are adequately disclosed are generally questions that should be left to

8   the trier of fact." *In re Juno Therapeutics, Inc.*, 2017 WL 2574009, at *3 (W.D. Wash. June 14,

9   2017) (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)); *see also Berson*, 527 F.3d

10  at 986 (reversing dismissal even though, "[w]ith the benefit of hindsight and some help from the

11  briefs, we can see how this exchange might be interpreted" as defendants contend).

12          Equally without merit, Defendants accuse (Mot. at 8) Lead Plaintiff of "obfuscation" for

13  using the phrase "Impinj Platform" in the Complaint and for alleging that the "Impinj Platform"

14  lacked the ability to accurately locate tagged items.  Defendants' attack is misguided in that it was

15  Defendants themselves who represented that "[t]he *Impinj Platform* …. delivers each item's

16  *unique … location.*" *See, e.g.*, ¶¶86, 89, 92, 96, 103, 110.  Defendants cannot be heard to

17  complain that Lead Plaintiff and the Complaint use the very terms that Defendants used in public

18  filings. Moreover, contrary to Defendants' assertions, the Complaint sufficiently details the

19  locationing problem, including that it impacted all three Platform layers (¶¶47, 66), [Redacted]

20  [Redacted] (¶¶45, 154), and [Redacted] (¶¶43, 47).  Defendants'

21  insistence on yet more detail misconstrues the pleading requirements and ignores that "Plaintiffs

22  do not need to prove their case to survive this Motion." *Juno*, 2017 WL 2574009, at *5.

23          1.    **Defendants' Attempt To [Redacted] Fails**

24  [Redacted]

25  [Redacted] ¶¶42-43, are fatal to Defendants' motion. Recognizing that, Defendants

26  contend (Mot. at 11-12) that the Court should ignore them because [Redacted]

27  [Redacted] Not so. [Redacted]

Redacted

Redacted ¶¶42-43, 47.

Second, as a legal matter, the fact that an admission "occurred before the class period does *not* strip the allegation of its probative value." *BofI Holding*, 2017 WL 2257980, at *11–12.  Indeed, "facts predating the class period *are* relevant to establish that statements made during the class period were materially false." *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *4 (C.D. Cal. Mar. 12, 2012) (collecting cases). Redacted

Redacted

Redacted

Equally baseless is Defendants' related suggestion (Mot. at 12) that the Court should ignore Redacted

Redacted In making this argument, Defendants ignore the Complaint's other well-pled allegations that Impinj did *not* solve the locationing problem before the IPO, which adversely impacted its results after the IPO. ¶¶47, 72. They also ignore that Diorio, *himself*, recognized that Redacted

Redacted ¶¶43, 47.  Defendants also ignore, as a legal matter, that Plaintiffs are entitled at this stage to the "reasonable inference" that the locationing problem Redacted

Redacted was not somehow miraculously solved in mere months.  *See Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010) (district court erred in "fail[ing] to draw a reasonable inference in the plaintiffs' favor" that the admitted problem existed when statements were made to investors six months earlier).

*In re BofI Holding* is instructive on this point. There, BofI's executive made pre-class period admissions about "understaffing" that allegedly contradicted his class period statements eleven months later. 2017 WL 2257980, at *11.  As Defendants do here, BofI argued that the court should disregard the admissions because they were made before the class period and it was possible that the "understaffing" did not persist during the class period eleven months later. *Id*. In

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS
Case No. 3:18-cv-05704-RSL
-10-
BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

rejecting this "temporal nexus" argument, the court explained that "while it is true that Lead Plaintiff has not demonstrated how long the 'understaffing' existed, or whether it remained true until [the end of the class period] and the preceding several quarters," plaintiff is entitled to the "reasonable inference that no changes had been made in the interim and that [BofI] remained understaffed during the quarters that were the subject of [defendant's] statements" to investors. *Id*.  As the court emphasized, "[t]he PSLRA and Rule 9(b) only require that Lead Plaintiff provide particularized reasons why a statement was false or misleading at the time it was made, not that Lead Plaintiff prove its entire case in the complaint and without the benefit of reasonable inferences." *Id*. at *12.

The same holds true here, particularly given the nature of the problem (¶¶42, 44); Redacted Redacted (¶¶43, 47); and the corroborating accounts of Director of Product 1 (who was at Impinj up to the filing of the Registration Statement), Director of Product 2 (who was at Impinj through the filing of the Registration Statement and over half of the other misleading statements), and VP of Sales (who was at Impinj through all of the misleading statements and nearly the entire Class Period) (¶¶45, 47-48, 53-55, 60, 63-64, 72).

Defendants also try (Mot. at 12) to contort and rewrite Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

### 2. Defendants Fail to Discredit the Former Impinj Executives' Accounts

Courts in the Ninth Circuit credit former employees' accounts in securities litigations so

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS
Case No. 3:18-cv-05704-RSL

-11-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

1   long as the witnesses are identified in the complaint with "sufficient particularity" to support "the

2   probability that a person in the position occupied by the source would possess the information

3   alleged." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Accounts provided by such

4   witnesses are accepted as true for pleading purposes if it is "plausible" that the witness "would

5   know, or could reasonably deduce," the information attributed to them. *Berson*, 527 F.3d at 985.

6          Here, the Complaint details each of the former employee's background, job titles,

7   experience, responsibilities, period of employment, and the executives to whom he reported. ¶51

8   (describing Director of Product 1, who had over fifteen years of experience in the industry and,

9   while at Impinj, had overall responsibility for the chip business, the reader business, and the

10  software business from a product management point of view); ¶62 (describing Director of Product

11  2, who had six years of experience in the industry and, while at Impinj, worked and interacted

12  with the engineering team on a daily basis and was responsible for, among other things, the Item

13  Location Accuracy Program); ¶¶68-70 (describing VP of Sales, who served as a sales executive at

14  Impinj for nearly a decade, including throughout virtually the entire Class Period, and was

15  responsible for communicating with customers, the Impinj sales team and the Company's

16  leadership to understand current market conditions and future business).

17         The Complaint further details the bases for each of these witnesses' accounts, including

18  their interactions with Defendants Diorio, Brodersen, and other Impinj executives. ¶45 (Director

19  of Product 1 attended executive meetings with Defendants Diorio and Brodersen in which they

20  were told that the Platform was unable to accurately determine location); ¶¶42-43, 47 (Redacted

21  Redacted );

22  ¶¶44, 48 (Director of Product 2 worked in labs with Impinj engineers); ¶¶49-50 (Redacted

23  Redacted );

24  ¶¶70-72 (VP of Sales attended weekly sales meetings, during which "the Platform's inability to

25  locate tagged items was absolutely a concern that was brought up," as well as in "relation to

26  specific customer engagements"). Significantly, the accounts provided by these executives

27  corroborate each other Redacted *See, e.g.*, ¶¶45, 47-48, 60

(Director of Product 2 corroborates Director of Product 1's account regarding Impinj's location problems and retaliation); ¶¶42-50, 53-55, 63-64, 72 (witnesses all confirm the Platform's inability to accurately determine location).

Defendants' challenges to their former employees' accounts fail.  Defendants first contend (Mot. at 9) that Director of Product 1's account must be disregarded because he was terminated a few days before the Class Period. But courts have rejected that argument, refusing to "disregard such allegations because the witness left [the defendant-company] before the [class period]," explaining that, just because the witness left the defendant-company before the class period, "it simply does not follow that the Court must completely shut its eyes to such allegations." *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *7 (C.D. Cal. Apr. 12, 2016). Indeed, the Ninth Circuit and district courts have repeatedly credited the accounts of former employees terminated before the Class Period.  *See*, *e.g.*, *Quality Sys.*, 865 F.3d at 1145 (crediting statements from confidential witness who "was not at QSI during the Class Period").

Director of Product 1's account is particularly probative here because, unlike in the cases cited by Defendants, (i) he was fired just *days* before Impinj filed its Registration Statement (¶58); (ii) he was fired *because* he identified the misrepresentations and omissions in the Registration Statement at the core of this case (*id*.); (iii) the misrepresentations he reported concerned a significant flaw in the Impinj Platform ███ Redacted ███ (¶¶45, 47); and (iv) the accounts of other witnesses who remained at Impinj *after* the filing of the Registration Statement verify that the problem continued throughout the Class Period (¶¶47, 63-65, 72).

Also baseless is Defendants' contention (Mot. at 9-10) that the former employees were not in a "position to know" that the Impinj Platform lacked one of its core features because they "worked in product management and sales, not engineering."  The three former executives were each highly qualified professionals with extensive experience and credentials. ¶¶51, 62, 68-70. The two Directors of Product attended meetings and discussed the Platform's inability to locate tagged items directly with the Company's ███ Redacted ███ ███ Redacted ███ ¶¶44-45, 48. ███ Redacted ███

1

███████████████████████ Redacted ███████████████████████

2

███████████████████████ Redacted ███████████████████████ and attendance at review

3   meetings. ¶¶44-50. They also described how they directly confronted Defendants about the

4   Company's misrepresentations about the Platform's location inadequacy. ¶¶56-60, 63-65.

5       Moreover, the Ninth Circuit in *Berson* made clear that a job title is irrelevant, and what

6   matters is whether it is "plausible" that the witness "would know, or could reasonably deduce" the

7   undisclosed facts.  527 F.3d at 985 ("any number of company employees would be in a position to

8   infer" the undisclosed facts).  Here, it is not only "plausible," it is indisputable that the Directors

9   of Product and VP of Sales each "would know, or could reasonably deduce," that Impinj's lone

10  product platform did not deliver one of its core functions.

11          **B.     The Complaint Amply Alleges Misleading Statements
                     <u>And Omissions Attributing Increased Revenues to Increased Demand</u>**

12      The Complaint also details how Defendants buttressed their statements touting the

13  Platform's ability to "locate" tagged items with further misrepresentations that Impinj

14  experienced "increased demand" for its Platform's endpoint ICs, which purportedly was "driving"

15  the increase in the Company's reported revenues each quarter in 2017. ¶¶95, 99, 109, 113, 130,

16  143, 149.  These statements were false or, at minimum, misleading for at least two reasons.

17      *First*, contrary to Impinj's representations to investors, demand had not *increased* for the

18  first, second, third, or fourth quarters of 2017. ¶¶71, 75-76.  Rather, as the VP of Sales explained,

19  demand *declined*, with sales executives specifically telling Defendant Brodersen each quarter that

20  demand was not as strong as the Company publicly represented. *Id*. Statements falsely touting

21  "growing demand," such as Defendants' misstatements here, are actionable because they "go to

22  current business conditions and are capable of being proven false at the time they were made."  *In*

23  *re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 971-72 (N.D. Cal. 2009).

24      *Second*, it was misleading for Impinj to tout "increased demand" as the driver of Impinj's

25  "increase in revenues" without disclosing that Impinj was generating "revenue" by pulling in

26  sales from future periods and recording them in the current quarter. *See Murphy v. Precision*

27  *Castparts Corp.*, 2017 WL 3084274, at *9 (D. Or. June 27, 2017) (defendant's representations

about its "growth" actionable where it "did not include disclosure of the additional facts that [defendant] was aggressively pulling in sales").

In their motion, Defendants attempt to rewrite Plaintiff's allegations and address strawman arguments. Defendants first (Mot. at 12) misstate the reason why Plaintiff alleges that Impinj's *pre*-Q2 2017 statements were misleading. Consistent with the Complaint's other allegations, these statements were misleading because they omitted that the Platform's location feature did not work, which limited demand. *See* ¶¶42, 48-49, 66. Moreover, Plaintiff does not have to prevail on *all* the alleged misstatements to survive Defendants' motion; to the contrary, Plaintiff "need only plead a *single* materially false misrepresentation to survive a motion to dismiss." *In re BofI Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at *8 (S.D. Cal. Sept. 27, 2016).

Defendants also contend (Mot. at 12-13) that their statements were truthful because they accurately listed the *amount* of their revenues each quarter of 2017. But Plaintiff is challenging Defendants' representations about the *source* of the increased revenues, not the reported amount of those revenues. *See* ¶¶95, 99, 109, 113, 130, 143, 149-150. Defendants told investors each quarter that "increased demand" for their IC endpoints "drove" their increased revenues when actually (i) demand decreased each quarter in 2017, and (ii) Impinj generated significant revenue by pulling in sales from future periods. ¶¶76-77. By failing to disclose these facts, Impinj violated the rule that "once a company 'puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success.'" *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *14 (C.D. Cal. Oct. 1, 2013) (misleading to conceal "the true causes of the increased sales and financial success"). Moreover, when Impinj began pulling in orders from future periods into the current quarter, it "was obligated to disclose that the comparison between the earlier and later revenue figures was *not* apples-to-apples." *Police and Fire Ret. Sys. of the City of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1083 (N.D. Cal. 2015).

Defendants next try (Mot. at 13) to waive away their representations about "increased demand" as mere puffery – i.e., corporate fluff. In support of this effort, Defendants ignore the allegations and focus (incorrectly) on their characterizations of demand as "strong." But Plaintiff

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS
Case No. 3:18-cv-05704-RSL
-15-
BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

is challenging Defendants' repeated misrepresentations that demand had "increased" from the prior quarter, and that revenues "increased" because of that "increased" demand. *See, e.g.*, ¶¶95, 99. These challenged statements are objectively verifiable statements of fact that cannot simply be cast aside as "'feel good' optimistic statements." *Quality Sys.*, 865 F.3d at 1144 (statement that sales pipeline "was full and growing" was actionable and more than a "'feel good'" statement).

*Third*, Defendants assert (Mot. at 13), based on their own speculation and impermissible counter-narrative, that demand for the Platform's IC end-point tags was *not* impacted by the Platform's inability to locate tagged items.  Defendants' fact-intensive argument inferred from documents outside the Complaint is belied by the Complaint's well-pled allegations and cannot be credited at this stage.  *See Orexigen*, 899 F.3d at 1009.  Defendants' self-serving assertion (Mot. at 13) that Impinj would have reported a sharper decline in revenues if the Platform did not deliver accurate locations similarly cannot be credited at this stage and, in any event, ignores both the Platform's *non*-location capabilities and Impinj's revenue manipulation.

*Finally*, Defendants assert (Mot. at 14) that the Complaint's allegations regarding Impinj's practice of pulling in future orders is "conclusory."  Not so.  The Complaint pleads *who* instructed Impinj's sales executives to pull in future orders (Brodersen), *when* future orders were pulled in (shortly before the end of each quarter in 2017), *what* product they pulled in (IC units), and the *extent* of the orders pulled in (20% or more of a client's order).  ¶77. No additional detail is required at this stage.  *See*, *e.g.*, *Murphy*, 2017 WL 3084274, at *9 n.3 ("Plaintiffs are not required to identify specific pull in transactions.").[2]

## C.  The Complaint Raises A Strong Inference Of Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705.  Plaintiff need only raise a

---

[2] Defendants' own out-of-circuit authority states that Plaintiff "is *not* required to describe in detail the circumstances of [defendant's] pulling in activities" at the pleading stage and, instead, need only plead the "who, what, when, where, and how of the pulling in" – which Plaintiff has done.  *See In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1084 (2005).  Moreover, while Defendants try to raise the pleading bar and fault Lead Counsel for not collecting more granular details from VP of Sales about Impinj's pulling-in practices, they ignore that their counsel specifically wrote to Lead Counsel *prohibiting* it from "eliciting statements from [the VP of Sales]" that revealed "confidential business information."  *See* Ex. 15 to Watts Declaration.

"strong inference" of scienter that "need not be irrefutable … or even the most plausible," with no "smoking-gun" required. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324-26 (2007). The test is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). The Complaint here readily satisfies that standard.

*First*, the Complaint contains [Redacted] [Redacted] [Redacted] These admissions establish Diorio's scienter. That Diorio [Redacted] [Redacted] Courts recognize that it is a matter of "common sense" that "allegations supporting an inference of scienter must often refer to circumstances preceding the statements, since such circumstances would be among those knowable at the time of the statements." *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 971-72 (N.D. Cal. 2005). Indeed, "facts relevant to scienter will *ordinarily* date from before any alleged misrepresentations" *Id*. This is particularly true here because other detailed allegations confirm that the Platform continued to lack the represented location ability both when Diorio signed the Registration Statement and throughout the Class Period. ¶¶47, 72.

Moreover, while Defendants suggest (Mot. 12) that Impinj would *not* have made the same representations about the Platform's "location" capability at the time of [Redacted] [Redacted] they ignore that they *did* make the same representations. Indeed, on October 1, 2015, *before* [Redacted], Impinj had already sent to the SEC a proposed Registration Statement that contained the same, verbatim representations, including that the Platform "delivers each item's *unique ... location*." ¶42 n.16.

*Second*, Directors of Product 1 and 2 warned Impinj and the Executive Defendants that the Company's statements about the Platform's location capabilities were false and misleading. Director of Product 1 met with Brodersen just days before the IPO and told him emphatically that location did not work and could not be included in the Registration Statement, previewing the

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS
Case No. 3:18-cv-05704-RSL

-17-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

same concerns to Diorio. ¶57. Director of Product 2 corroborated his former colleague's account (¶¶60, 63-65), █████████████████ Redacted █████████████████. These facts provide compelling scienter evidence. *See In re Peoplesoft, Inc. Sec. Litig.*, 2000 WL 1737936, at *3 (N.D. Cal. May 25, 2000) ("guilty knowledge may be inferred … [from] statements by witnesses that they told the actor the true facts before the false statement was made").

*Third*, the Complaint details how Impinj and its executives retaliated against Directors of Product 1 and 2 for reporting their concerns about the Company's misrepresentations. ¶¶56-60, 63-65. On the *same day* that Director of Product 1 was scheduled to discuss his concerns with Diorio – concerns he had already explained to Brodersen and previewed to Diorio – he was summarily fired. ¶58. Director of Product 2 likewise was retaliated against after reporting his concerns about the inaccuracies in the Registration Statement. ¶65. That Defendants retaliated against these men after they voiced concerns that the Company had misrepresented the Platform's location capabilities to investors shows they intended to silence these witnesses and supports an inference of scienter. *See Crane*, 87 F. Supp. 3d at 1085 (allegations that employees were "subsequently demoted or terminated" after protesting disclosures supported scienter).

Contrary to Defendants' suggestion (Mot. at 19), it is irrelevant that the SEC – according to Defendants – has not yet taken enforcement action against Impinj after recently learning of the VP of Sales' whistleblower complaint. As the Ninth Circuit explained in reversing the dismissal of a securities action, "we draw no inference from the SEC's decision not to … charge defendants with fraud," but rather, "[a]t this stage, we accept [plaintiffs'] allegations as true." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 707 n.5 (9th Cir. 2012).[3]

*Fourth,* the Executive Defendants' attendance at meetings and receipt of reports in which the Platform's inability to locate tagged items was discussed further strengthens the scienter inference. *See, e.g.*, ¶45 (█████████████████ Redacted █████████████████
█████████████████ Redacted █████████████████);

---

[3] Likewise, Defendants' *ipse dixit* assertions (Mot. at 19) about the Audit Committee's investigation into the VP of Sales' concerns cannot be credited at this stage. Indeed, "[t]o rule otherwise would create a huge fox-guards-the-chicken-house loophole in our private securities law enforcement." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245-46 (N.D. Cal. 2008).

¶46 (discussions at sales meetings showing that "Defendants Diorio and Brodersen knew of the Impinj Platform's inability to accurately locate tagged items"); ¶50 (█████ Redacted █████ Redacted █████); *see also In re Vocera Commc'ns, Inc. Sec. Litig.*, 2015 WL 603208, at *1 (N.D. Cal. Feb. 11, 2015) (allegations that "Defendants were consistently present at revenue meetings" in which company's true state of affairs was discussed supported scienter.).

In response to these allegations, Defendants posit that it is *possible* that the Executive Defendants were ██████████ Redacted ██████████ Mot. at 16. While virtually anything is *possible*, the relevant question at this stage is what is *plausible*. As one court recently explained in rejecting a similar challenge, "[i]t is far more plausible that the CEO, CFO, and CTO of [the company] knew of the outcomes of quality assurance testing … than is the alternative inference, 'namely that [the] executives were simply unaware of the high degree of inaccuracy in [the] devices alleged.'" *Robb v. Fitbit Inc.*, 2017 WL 219673, at *5 (N.D. Cal. Jan. 19, 2017). The same is true here, particularly because █Redacted█ ██████████ Redacted ██████████ ██████ Redacted ██████ ¶¶42-43, 50.

Moreover, Defendants are wrong when they assert (Mot. at 15) that the former Impinj executives had "very limited interactions" with Defendants Diorio and Brodersen. Indeed, the opposite is true. ¶51 (Director of Product 1 "frequently participated in … meetings attended by Diorio and Brodersen"); ¶62 (Director of Product 2 "regularly attended meetings with Defendants Diorio and Brodersen"); ¶¶68, 70 (VP of Sales reported directly to Defendant Brodersen, frequently interacted with the Executive Defendants, reported every week to Defendant Brodersen, and attended regular meetings with Diorio and Brodersen).

*Fifth*, the Impinj Platform's importance to the Company's bottom line further strengthens the scienter inference under the core-operations doctrine. *See, e.g., Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014) ("we can impute scienter based on the inference that key officers have knowledge of the 'core operations' of the company."); *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016) ("contributions these devices made to Fitbit's revenue stream in 2015"

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS
Case No. 3:18-cv-05704-RSL                          -19-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

strengthened scienter inference).  Here, Diorio was the CEO; Fein was the CFO; Brodersen was the President and COO; and they were all deeply involved. ¶170. The Company has only one product platform, which is the source of 99% of its revenues. ¶20. On these facts, it would be absurd to believe that Impinj's top executives did not know of the Platform's inability to fulfill one of its core functions.

*Sixth*, Diorio made repeated representations about the Impinj Platform's purported "location" capability, while professing to know what he was talking about. ¶163; *see also S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1258 (W.D. Wash. 2009) ("Court can infer at least deliberate recklessness because [defendant] repeatedly told the investing public 'I know what I'm talking about.'"). Diorio's repeated touting of the Impinj Platform's location ability, without disclosing the "adverse information that cuts against the positive information," strengthens the scienter inference against him.  *Schueneman*, 840 F.3d at 706.

*Finally*, although neither "motive" nor "insider sales" are required to raise a scienter inference (*see Tellabs*, 551 U.S. at 325), the scienter inference here is bolstered by the fact that, through their misstatements, Impinj and its venture-capital financiers completed their long-desired IPO and secured over $185 million, with Diorio selling over $2.2 million of his personal shares in the offerings.  *See FitBit*, 2017 WL 219673, at *7 (allegations that management had an incentive to conceal information about company's primary product in advance of IPO "relevant to a holistic inquiry into scienter"); *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) ("motive to inflate sales to raise financing" circumstantial evidence of scienter).[4]

Viewed collectively, as they must be, these facts and the numerous additional ones in the Complaint establish a strong inference of scienter.  *See VeriFone*, 704 F.3d at 710 ("Although [defendants] attack individual allegations in isolation, they cannot overcome the overwhelming inference drawn from a holistic view.").

---

[4] Contrary to Defendants' assertion, the Executive Defendants' allowing a material weakness in "disclosure controls and procedures" to persist for 15 consecutive quarters without being remediated does *not* "negate" scienter, but rather supports it.  *See In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018) ("weak internal controls will support an inference of scienter"). This is particularly so because Impinj each quarter "falsely represented that they had implemented measures to correct these deficiencies."  *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *13 (C.D. Cal. July 1, 2008) (distinguishing *BearingPoint*).

1

### 1.     Defendants' Alternative "Explanation" Based On
### <u>Manufactured Facts Outside The Complaint Cannot Be Credited</u>

2

3          Defendants also try (Mot. at 15) to rebut the scienter inference by injecting their own

4    self-serving narrative based on "facts" found nowhere in the Complaint.  But as the Supreme

5    Court and Ninth Circuit have explained, in weighing scienter inferences, the court must continue

6    "constantly assuming the plaintiff's allegations to be true" and may only consider inferences that

7    can be "draw[n] from the facts alleged." *Tellabs*, 551 U.S. at 324, 326-27; *N. Mex. State Inv.*

8    *Council v. Ernst & Young LLP*, 641 F. 3d 1089, 1094-95 (9th Cir. 2011) (reversing dismissal of

9    securities action and explaining that, in conducting its analysis, the court must "accept the

10   plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs").  Nor

11   may Defendants evade these principles by invoking the "incorporation-by-refence" doctrine.  As

12   the Ninth Circuit explained in *Orexigen*, "[t]he incorporation-by-reference doctrine does not

13   override the fundamental rule that courts must interpret the allegations and factual disputes in

14   favor of the plaintiff at the pleading stage." 899 F.3d at 1014.  Indeed, it is "improper to assume

15   the truth of an incorporated document if such assumptions only serve to dispute facts stated in a

16   well-pleaded complaint." *Id.* at 1003.

17         Here, Defendants do exactly what the Supreme Court and Ninth Circuit say a defendant

18   cannot do in attempting to defeat a scienter inference.  For example, Defendants contend, based

19   on their say-so, that "the Company's gateways *did* provide locationing."  Mot. at 21 (citing

20   nothing).  They further assert – again citing nothing and ignoring the Platform's other features –

21   that consumers would not have purchased any of their products if the Platform did not accurately

22   locate tagged items as Plaintiff alleges.  Mot. at 20-21. And, finally, they say, based on their

23   word alone, that "[t]he decline in endpoint IC demand occurred *when Impinj disclosed* it to the

24   market and *for the reasons the Company provided*." Mot. at 21 (citing nothing).  These self-

25   serving assertions in Defendants' brief – which simply amount to a denial of liability – do *not*

26   "assum[e] the allegations to be true," are *not* "drawn from the complaint," do *not* properly rely

27   upon the incorporation-by-reference doctrine, and do *not* overcome the strong inference of

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

scienter. *See Orexigen*, 899 F.3d at 999 ("If defendants are permitted to present their own version of the facts at the pleading stage … it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief.").

Moreover, Defendants' litigation story, even if it could be credited at this stage (which it cannot be), does not warrant dismissal. For it to be accepted, the Court would need to find that the three former Impinj executives relied upon in the Complaint fabricated consistent and elaborate accounts of the Impinj Platform's locationing problems and Defendants' retaliation against them. It would further require the Court to accept Defendants' explanation Redacted
Redacted
Redacted
Redacted
Redacted And it would require the Court to inappropriately resolve factual disputes in Defendants' favor by adopting their far-fetched temporary "lead time" explanation for Impinj's sharp decline in demand and revenues, even though that explanation was refuted by the VP of Sales (whose account Impinj's Board found serious enough to report to the SEC) (¶¶76, 83-84), as well as that, "in order to carry their burden on scienter, Plaintiffs do not need to invalidate the inferences which Defendants raise." *McGuire v. Dendreon Corp.*, 2008 WL 5130042, at *7 (W.D. Wash. Dec. 5, 2008).

In sum, Defendants' counter-narrative is meritless and, more relevant here, does not override the strong inference of scienter at the pleading stage. *See Fitbit*, 2017 WL 219673, at *8 ("Whether in fact the Fitbit devices failed to measure users' heart rates accurately, and whether in fact Fitbit defendants knew of such failure, are questions to be determined another day.").

### D.   The Complaint Adequately Alleges Loss Causation

To plead loss causation sufficiently, the Complaint need only include "a short and plain statement" that "provide[s] a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS
Case No. 3:18-cv-05704-RSL
-22-
BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

1    12(b)(6) dismissal is inappropriate." *Gilead*, 536 F.3d at 1057. The Supreme Court has cautioned

2    that pleading loss causation "should not prove burdensome." *Dura Pharm.*, 544 U.S. at 347.

3        Here, the Complaint alleges that Impinj's stock price was artificially inflated throughout

4    the Class Period by Defendants' materially false and misleading statements and omissions about

5    the Platform's "location" capability and related demand.  ¶¶172-188. Plaintiff further alleges that

6    the Platform's inability to locate tagged items negatively impacted revenues and demand for the

7    three Platform layers, including IC units.  ¶¶66-78. Following disclosures of that reduced revenue

8    and demand, Impinj's stock price plummeted over 80%, wiping out more than $669 million in

9    shareholder value.  ¶184.  Nothing further is required at the pleading stage.[5]

10        Defendants nonetheless erroneously contend (Mot. at 21-23) that loss causation cannot be

11   established because Impinj did not confess publicly that demand decreased because its Impinj

12   Platform does not deliver its represented location feature. Defendants' precise argument was

13   squarely rejected by the Ninth Circuit in its most recent loss causation decision, which clarified

14   the "correct test" for loss causation.  Indeed, in *First Solar*, the Ninth Circuit held that loss

15   causation involves "no more than the familiar test for proximate cause" and can be demonstrated

16   in "an infinite variety of ways."  881 F.3d at 753.  The Circuit rejected Defendants' argument here

17   and held that loss causation does *not* require that a disclosure reveal the fraud; rather,

18   "[r]evelation of fraud in the marketplace is simply one of the 'infinite variety' of causation

19   theories a plaintiff might allege to satisfy proximate cause." *Id*. at 754.   The Court further

20   explained that the line of cases that Defendants attempt to rely upon were "restrictive decisions"

21   that should each "be understood as fact-specific" and since "clarified."  *Id*.[6]  The Court next held

22   that a plaintiff, as here, may "prove loss causation by showing that the stock price fell upon the

---

[5] The Complaint further describes how analysts connected the decline in sales and demand to product functionality. *See, e.g.*, ¶176; ¶84 n.28 (Motley Fool analyst: "when you see sales growth decelerating and going negative for smaller-cap companies, that's a really bad sign. Of course, not something I was expecting at all. Very disappointing. Makes me wonder about the RFID technology, period.").

[6] Moreover, while Defendants rely upon *Oracle*, they ignore that the appeal involved the standards on a summary judgment motion. *See Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*, 793 F. Supp. 2d 1138, 1145 (C.D. Cal. 2011) ("Defendants' reliance on *Oracle* …, which addressed loss causation at the summary judgment stage … only underscores the necessity that a factual record be developed.").

1   revelation of an earnings miss, even if the market was unaware at the time that fraud had

2   concealed the miss." *Id*. at 754. Plaintiff has sufficiently pled loss causation under the controlling

3   test. *See* ¶¶172-188; *see also* ¶¶66-78.

4        E.    **The Complaint States A Claim Against Defendant Brodersen**

5        Defendants lastly contend (Mot. at 23-24) that Plaintiff cannot state a claim against

6   Brodersen because he did not personally "make" the misrepresentations.  This argument fails for

7   two separate reasons.

8        *First*, Defendant Brodersen is liable under Section 20(a) of the Exchange Act as a "control

9   person," even assuming *arguendo* that he did not "make" the misstatements.  *See* ¶¶23-24; 170;

10  210-216; *see also BofI*, 2017 WL 2257980, at *25 ("Countless other courts in this circuit have

11  found allegations describing similar executive and managerial responsibility and activities to be

12  sufficient for Section 20(a) liability at the motion to dismiss stage.").

13       *Second*, courts in this Circuit have found since *Janus* that "corporate officers who are

14  jointly involved in day-to-day operations and who each exercise power and control," such as

15  Brodersen, "may be jointly liable as statement 'makers' under Rule 10b-5." *S.E.C. v. Pocklington*,

16  2018 WL 6843665, at *5 (C.D. Cal. Nov. 29, 2018).  To satisfy the *Janus* requirement, it is

17  enough at this stage to plead that the executive-defendant was "able to and did control the

18  content" of the statements and was "provided with copies of documents alleged herein to be

19  misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to

20  prevent their issuance or cause them to be corrected." *In re Volkswagen "Clean Diesel" Mktg.,*

21  *Sales Practices, and Prods. Liab. Litig.*, 2017 WL 3058563, at *8-9 (N.D. Cal. July 19, 2017).

22  Lead Plaintiff has pled such facts – and more – here.  *See* ¶¶23, 24, 57, 170.

23  **IV.    CONCLUSION**

24       For these reasons, Defendants' Motion should be denied in its entirety. If, however, the

25  Court grants any part of the Motion, Plaintiff requests leave to amend under Fed. R. Civ. P. 15.

26

27

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS        -24-        BYRNES & KELLER LLP
Case No. 3:18-cv-05704-RSL                                     1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

1    Dated: April 9, 2019                    Respectfully submitted,

2                                            **BYRNES & KELLER LLP**

3                                            */s/ Bradley S. Keller*

4                                            Bradley S. Keller, WSBA# 10665
                                             1000 Second Avenue, 38th Floor
5                                            Seattle, Washington 98104
                                             Telephone: (206) 622-2000
6                                            Facsimile: (206) 622-2522
                                             bkeller@byrneskeller.com
7

8                                            *Liaison Counsel for Plaintiff Employees'*
                                             *Retirement System of the City of Baton Rouge*
9                                            *and Parish of East Baton Rouge*

10

11                                           **BERNSTEIN LITOWITZ BERGER**
                                             **   & GROSSMANN LLP**
12                                           Jonathan D. Uslaner
                                             12481 High Bluff Drive, Suite 300
13                                           San Diego, California 92130
                                             Telephone: (858) 793-0070
14                                           Facsimile: (858) 793-0323
                                             jonathanu@blbglaw.com
15                                           -and-
                                             Salvatore Graziano (admitted *Pro Hac Vice*)
16                                           Michael Blatchley (admitted *Pro Hac Vice*)
                                             1251 Avenue of the Americas
17                                           New York, New York 10020
                                             Telephone: (212) 554-1400
18                                           Facsimile: (212) 554-1444
                                             salvatore@blbglaw.com
19                                           michaelb@blbglaw.com

20

21                                           *Counsel for Plaintiff Employees' Retirement*
                                             *System of the City of Baton Rouge and Parish*
22                                           *of East Baton Rouge*

23

24

25

26

27

1

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2019, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.


/s/ Bradley S. Keller
Bradley S. Keller, WSBA# 10665

*Liaison Counsel for Plaintiff Employees'
Retirement System of the City of Baton Rouge
and Parish of East Baton Rouge*

LEAD PLAINTIFF'S OPP. TO MOTION TO DISMISS
Case No. 3:18-cv-05704-RSL

-26-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000