UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

In re IMPINJ, INC.,
SECURITIES LITIGATION

No. C18-5704RSL

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO
DISMISS

This matter comes before the Court on "Defendants' Motion to Dismiss Consolidated Class Action Complaint." Dkt. # 41-1 at 7-37. Defendants argue that plaintiffs' allegations of falsity, scienter, and loss causation do not satisfy the pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4 and 78u-5. Defendants also argue that the complaint fails to state a claim against defendants Eric Brodersen and/or Evan Fein. Having reviewed the record in this matter and having heard the arguments of counsel, the Court finds as follows:

**THE CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs filed this litigation on behalf of all persons who purchased or otherwise acquired the common stock of Impinj, Inc., between July 21, 2016, and February 15, 2018. Impinj's primary business is selling a "platform" comprised of integrated circuits with memory chips ("ICs"), connective devices, and software that can be used to tag and wirelessly connect

everyday items to the digital world.[1] Plaintiffs allege that Impinj, its Chief Executive Officer (Chris Dorio), its Chief Financial Officer (Evan Fein), and its President and Chief Operating Officer (Eric Brodersen) made false and misleading statements to the public regarding the platform's ability to identify a tagged item's unique location. Plaintiffs allege that the platform's locationing capabilities were highlighted to the public in various regulatory filings and investor communications throughout the class period. The company represented that the platform's ability to transmit an item's unique location, which Dorio at one point asserted could be done with a margin of error of 1.5 feet, would allow the company to tap into valuable new markets, including health care. Plaintiffs allege, however, that the representations were false and that Dorio and Brodersen were informed, prior to the company's initial public offering and throughout the class period, that the platform was not able to accurately locate tagged items. As of January 2016, six months before the start of the class period, Dorio internally acknowledged that Impinj had not yet put forth a concerted effort to solve the locationing problem, but was confident that it could overcome the problem in a few years. Plaintiffs further allege that Impinj posted on an internal wiki (a collaborative website or knowledge bank) the results of pilot projects showing that the platform was unable to place tagged items in the correct room or on the correct floor and that both Dorio and Fein accessed the wiki. Finally, two Impinj employees who raised (or scheduled a meeting to raise) concerns regarding the disparity between the company's public statements and the platform's actual capabilities were fired.

---

[1] Plaintiffs allege that "[t]he Impinj Platform supposedly worked as follows: First, the user affixes an endpoint IC, which is approximately the size of a quarter, on the thing that they want to track (e.g., inventory, products, people). The endpoint IC then transmits [radio-frequency identification system] radio-wave signals that are detectable by the Impinj connective device. The transmitted data then - according to the Company - enables the connective device to determine the location of the tagged item, as well as its authenticity and identity (which Impinj collectively refers to as 'Item Intelligence'). Finally, Impinj's connective device connects with the user's computer, where the transmitted data - the 'Item Intelligence' - can be reviewed and analyzed using Impinj's 'ItemSense' software." Dkt. # 35 at ¶ 26.

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS      -2-

Plaintiffs allege that the platform's inability to identify the unique location of tagged items made the product less valuable to end users and had an adverse effect on market demand. During the first quarter of 2017, Impinj's sales team recognized a decline in demand for platform components, including IC endpoints, and reported the decline to Brodersen at weekly sales meetings. The decline was discussed in tandem with what the sales team thought was the main cause: the fact that the platform had locationing problems. Brodersen was specifically told that demand was not accelerating or growing as the company had publicly represented. Fein was personally involved in determining IC unit demand levels. Nevertheless, the Q1 and Q2 Forms 10-Q for 2017, signed by Dorio and Fein, reported increased demand for IC endpoints. Plaintiffs allege that Impinj was temporarily able to hide the decline in demand from the market because Brodersen pressured Impinj's sales people to pull future IC endpoint sales orders into the current quarter throughout much of 2017.

On August 3, 2017, Impinj announced a 10% reduction in its expected IC unit shipments. When the markets opened the next day, its stock price dropped from $47.92 to $37.52 per share, a loss of 22%. Impinj attributed the decline in IC endpoint shipments to its customers' response to a change in manufacturing lead times. On November 1, 2017, the company announced weaker-than-expected revenues for Q3 2017 and reduced its revenue projection for Q4 2017. Impinj acknowledged that its revised outlook was the result of a decline in IC demand. The Company's share price, which had dropped a bit since August to $32.80, fell another 34%. On February 1, 2018, Impinj announced its preliminary estimate of Q4 2017 revenue (two weeks before it was scheduled to make that disclosure) and provided Q1 2018 guidance that was significantly lower than Q1 2017 and Q4 2017. The company also announced Fein's resignation and did not name a replacement. Analysts downgraded Impinj's stock, noting alarm at Fein's abrupt departure. The share price tumbled again from $22.86 to $12.16. On February 15, 2018, Impinj missed the preliminary estimate of Q4 2017 revenue it had announced only two weeks

earlier and announced that it would no longer provide annual forecasts of IC unit shipments. Impinj's stock price, which had rebounded slightly to $13.43 per share, fell to $11.07. Plaintiffs allege that market commentators eventually linked the decline in market demand to problems with the platform's functionality.

Plaintiffs further allege that the executive team was driven to exaggerate the functionality of the platform in order to have a successful IPO, that Impinj has admitted material weakness in its internal control over financial reporting, and that Impinj has had to defend a number of whistleblower suits.

Based on their allegations of false and materially misleading statements regarding the platform's ability to identify the unique location of tagged items and increasing market demand of IC endpoints, plaintiffs assert claims against all defendants for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* and against Dorio, Fein, and Brodersen under Section 20(a).

## LEGAL ANALYSIS

**A. Scope of Review**

Defendants seek dismissal of all of plaintiffs' claims and offer a number of documents for the Court's consideration. In the context of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court's review is generally limited to the contents of the complaint. Campanelli v. Bockrath, 100 F.3d 1476, 1479 (9th Cir. 1996). The Court may, however, consider documents referenced extensively in the complaint, documents that form the basis of plaintiffs' claims, and matters of judicial notice when determining whether the allegations of the complaint state a claim upon which relief can be granted. United States v. Ritchie, 342 F.3d 903, 908-09 (9th Cir. 2003).

Defendants have provided copies of documents cited in the complaint. These documents (Exhibits 2-18 to the Declaration of Gregory L. Watts (Dkt. # 43)) can be considered in ruling on the motion to dismiss because they form the basis of plaintiffs' claims and plaintiffs have not

challenged their authenticity. See Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds*, Galbraith v. County of Santa Clara, 307 F.3d 1119, 127 (9th Cir. 2002). In addition, the Court may take judicial notice of public documents that are "not subject to reasonable dispute because [they]: (1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Ev. 201. Most of the documents submitted by defendants were filed with and published by government agencies, and plaintiffs have not challenged their authenticity.

The use to which these documents can be put is more limited that defendants acknowledge, however. While their existence and the existence of the statements contained therein cannot be reasonably disputed, the truth of the factual statements and opinions presented in the documents has not been established. Whether Impinj accurately represented its products, market opportunities, and/or investigative results, for example, cannot be ascertained in the context of this motion to dismiss. The Court therefore takes notice of what was said, when it was said, and who said it without prejudice to plaintiff's ability to contest the accuracy of those statements. To do otherwise would be to assume the truth of defendants' regulatory filings despite plaintiffs' underlying contention that defendants were not truthful in their public representations. See Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998-99, 1003 (9th Cir. 2018).

**B. Standard of Review**

The question for the Court on a motion to dismiss is whether the facts alleged in the complaint sufficiently state a "plausible" ground for relief. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

> A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Plausibility requires pleading facts, as opposed to conclusory

allegations or the formulaic recitation of elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief. Factual allegations must be enough to raise a right to relief above the speculative level. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Nor is it enough that the complaint is factually neutral; rather, it must be factually suggestive.

Somers v. Apple, Inc., 729 F.3d 953, 959-60 (9th Cir. 2013) (internal quotation marks and citations omitted). All well-pleaded factual allegations are presumed to be true, with all reasonable inferences drawn in favor of the non-moving party. In re Fitness Holdings Int'l, Inc., 714 F.3d 1141, 1144-45 (9th Cir. 2013). If the complaint fails to state a cognizable legal theory or fails to provide sufficient facts to support a claim, dismissal is appropriate. Shroyer v. New Cingular Wireless Servs., Inc., 622 F.3d 1035, 1041 (9th Cir. 2010).

**C. Special Pleading Requirements for Exchange Act Claims**

In order to pursue a private action under Section 10(b) of the Exchange Act and Rule 10b-5 plaintiffs "must allege: (1) a material misrepresentation (or omission), (2) made with scienter, (3) on which plaintiff relied, (4) that proximately caused (5) economic loss, (6) in connection with the purchase or sale of a security." Reese v. BP Exploration (Alaska) Inc., 643 F.3d 681, 685 (9th Cir. 2011). In 1995, Congress raised the pleading requirements for these elements in order to deter the routine filing of shareholder lawsuits whenever a significant change in a company's stock price occurred. Congress was particularly concerned with litigation based on nothing more than (1) speculation that the company "must have" engaged in foul play and (2) the faint hope that the liberal rules of discovery would turn up some supporting evidence. See Joint Explanatory Statement to the PSLRA, H.R. CONF. REP. NO. 104-369 (1995), *reprinted in* 1995 U.S.C.C.N. 730. When alleging misleading statements or omissions, private securities plaintiffs are required to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In order to withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint must, as to each act or omission alleged to violate the securities laws, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Thus, private securities plaintiffs must "plead with particularity both falsity and scienter." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009).

The required state of mind for an Exchange Act claim is knowing or intentional conduct. In re Silicon Graphics Inc. Securities Litig., 183 F.3d 970, 975 (9th Cir. 1999). The Ninth Circuit has held that "reckless conduct can also meet this standard 'to the extent that it reflects some degree of intentional or conscious misconduct,'" otherwise known as "deliberate recklessness." South Ferry LP, # 2 v. Killinger, 542 F.3d 776, 782 (9th Cir. 2008) (*quoting* In re Silicon Graphics, 183 F.3d at 975-977). Simply alleging that statements were knowingly false or that defendants were deliberately reckless is not enough, however. Such allegations must be supported with references to specific facts, events, documents, and/or reports. In order to determine whether the complaint gives rise to a strong inference of intentional or deliberately reckless conduct, the allegations must raise an inference that is "more than merely 'reasonable' or 'permissible' - it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues and Rights, Ltd., 551 U.S. 308, 324 (2007). When determining the strength of the scienter allegations, each allegation, even if not compelling in and of itself, must be considered as part of the larger whole. Tellabs, 551 U.S. at 326 (noting that a "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically . . . . [T]he reviewing court must ask: When the allegations are accepted as true and

taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?").[2]

**1. Falsity**

Plaintiffs have specified two types of misleading statements: representations that the Impinj platform was capable of identifying the unique location of a tagged item (including representations specifying a margin of error) and representations regarding increasing demand for IC endpoints. As a general matter, plaintiffs have also alleged the reasons, supported by specific factual allegations, why each type of statement was false and misleading when made. With regards to statements regarding increasing or accelerating demand prior to Q1 2017, however, there are no allegations that could support a finding that demand had stalled or was in decline prior to that date. Plaintiffs have not, therefore, adequately alleged falsity regarding demand representations prior to Q1 2017.

**2. Maker of the False Statements**

The SEC's regulation implementing Section 10(b) makes it unlawful for "any person, directly or indirectly . . . [t]o make any untrue statement of material fact . . . ." 17 C.F.R. § 240.10b-5. "One 'makes' a statement by stating it." Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011). With regards to defendant Brodersen, plaintiffs make a single, conclusory allegation that he "made" one or more of the false statements at issue in this litigation. See Dkt. # 35 at ¶ 24. As required by the PSLRA, plaintiffs elsewhere specifically identify each allegedly false statement, when it was made, and who made it: plaintiffs do not allege that Brodersen said or wrote any of them.

---

[2] The Ninth Circuit applies the same standard, but first determines whether any individual scienter allegation, standing alone, is sufficient to raise a strong inference of scienter. "If none is sufficient alone, we then consider the allegations holistically to determine whether they create a strong inference of scienter taken together." In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1056 (9th Cir. 2014).

Plaintiffs' seek to impose liability on Brodersen for statements made by Dorio and Fein based on Brodersen's position in the company and his power to control and/or opportunity to prevent/correct corporate misstatements. In particular, plaintiffs allege that Brodersen was a key executive of Impinj with direct responsibility for the sales organization, that he was involved in the day-to-day operations of the Company, that he was involved in drafting, approving, and/or publishing certain allegedly false statements, and that he communicated with investors regarding the functionality of the platform and the demand for Impinj's products. Most of these allegations do not tie Brodersen to an actionable statement: he could, for example, manage day-to-day sales operations and have conversations with investors without ever making a false representation regarding the platform's locationing abilities or product demand. With regard to the allegations that Brodersen played some role in the drafting, approving, and/or publishing of the press releases attached to Form 8-K and other allegedly false statements, merely participating in the drafting of misleading statements is not enough to create liability under Section 10(b) or Rule 10b-5. Janus, 564 U.S. at 143 and 145. The "maker" of a statement is "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Id. at 142. A behind-the-scenes contributor to another's statement, such as a speech writer or one who provides false or misleading information that is incorporated into the statement, does not "make" the statement if the actual speaker or author ultimately controls the content and publication of the statement.[3]

> This rule follows from Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 [] (1994), in which [the Supreme Court] held that Rule 10b(5)'s private right of action does not include suits against aiders and abettors. See id., at 180 []. Such suits - against entities that contribute "substantial

---

[3] At the other end of the spectrum, a person or entity who authors a statement and simply has an agent read or publish it verbatim "makes" the statement even though he or she does not actually say the words aloud. Janus, 564 U.S. at 145 (suggesting that a playwright is generally understood to be the "maker" of statements delivered by the actor).

assistance" to the making of a statement but do not actually make it - may be brought by the SEC, see 15 U.S.C.A. § 78t(e), but not by private parties. A broader reading of "make," including persons or entities without ultimate control over the content of a statement, would substantially undermine Central Bank. If persons or entities without control over the content of a statement could be considered primary violators who "made" the statement, then aiders and abettors would be almost nonexistent.

Janus, 564 U.S. at 143. A person who drafts or contributes to a misrepresentation may have abetted the misrepresentation, but until the statement is made to the public, there could be no reliance or injury for purposes of Section 10(b) and Rule 10b-5. Janus, 564 U.S. at 143-44 (noting that dismissal is appropriate where "the public could not have relied on the entities' undisclosed deceptive acts" and nothing the defendants did "made it necessary or inevitable" that the subsequent statement to the investing public would contain a falsehood) (quoting Stoneridge Investment Partners, LLC v Scientific-Atlanta, Inc., 552 U.S. 148, 161, 166-67 (2008)).

Plaintiffs' allegations support an inference that Brodersen had the power to suggest what should be communicated to the public, but the Supreme Court has said that is not enough.[4] Plaintiffs must allege non-conclusory facts giving rise to a plausible inference that Brodersen, as

---

[4] To the extent district courts in California have found that a corporate officer who participates in the drafting of the offending statements and/or fails to exercise the power to correct misrepresentations "makes" the statements for purposes of Section 10(b), the Court respectfully disagrees. SEC v. Pocklington, 2018 Wl 6843665, *5 (C.D. Cal. Nov. 29, 2018), relies heavily on In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liab. Litig., 2017 WL 3058563 (N.D. Cal. July 19, 2017), which in turn relies on Reese v. BP Exploration (Alaska), Inc., 643 F.3d 681 (9th Cir. 2011). Reese was decided days after the Supreme Court issued its decision in Janus. The panel noted that, under existing Ninth Circuit law, a defendant can be liable under Section 10(b) for the misstatements of others if they substantially participate or are intricately involved in the preparation of the fraudulent statements. Id. at 693 n.8. The court then acknowledges Janus, noting that it set "the pleading bar even higher in private securities fraud actions seeking to hold defendants primarily liable for the misstatements of others." Id. The court found that Reese's claims were insufficient under the lower standard and could not be amended to meet the "newly enunciated standard" set forth in Janus. Id. Reese does not stand for the proposition that the Ninth Circuit is adhering to its pre-Janus test for "maker."

opposed to Dorio and Fein, possessed the ultimate authority over the content and dissemination of the statements they made. They have not done so.

### 3. Scienter

Plaintiffs have alleged facts giving rise to a strong inference that Dorio acted with knowledge, intent, or deliberate recklessness as to the alleged misrepresentations regarding the platform's ability to identify a tagged item's unique location. Dorio was in meetings where the problems with the locationing function were discussed, and, approximately six months before the class period began, he acknowledged both the problems and the fact that it would take a few years to find a solution. The Court finds that the allegations raise a compelling inference of scienter as to Dorio. There are no similar allegations as to Fein, however, and it is entirely possible that the Chief Financial Officer could perform his duties (and utilize the wiki) without being conversant in the engineering aspects of the business. Without more, plaintiffs have raised only a reasonable inference, but not a strong one, that Fein's statements regarding the platform's capabilities were made with scienter.

Plaintiffs' allegations regarding increasing demand for endpoint ICs after Q1 2017 raise a strong inference that Dorio and Fein acted with knowledge, intent, or deliberate recklessness. The inference is more than merely reasonable or permissible - it is cogent and at least as compelling as any opposing inference one could draw from the facts alleged. Plaintiffs allege that Fein was personally involved in determining IC unit demand levels and yet, even after the decline in demand was recognized, he continued to assert that revenues were driven by increased demand for IC endpoints. While the evidence is less straightforward as to Dorio, plaintiffs allege that he was specifically informed of the sales volume manipulation during monthly forecast meetings and quarterly review sessions. Brodersen was being apprized on a weekly basis of the slipping demand for Impinj's primary product. Although it is possible that Brodersen kept to himself the sales data he was receiving and unilaterally decided to mask the declining demand by

pulling future sales into the current quarter, such an inference is improbable given the importance of the revenue stream. Even if Dorio and Fein did not have actual knowledge of the decline in demand, the allegations give rise to a strong inference of deliberate indifference regarding the truth of their joint representations regarding increased demand for endpoint ICs after Q1 2017.

**4. Loss Causation**

In order to have a claim under the Exchange Act, plaintiffs must also allege a causal connection between defendants' material misrepresentations and plaintiffs' loss. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005). No special pleading standard applies to loss causation: it is simply a variant of proximate cause, and the allegations of the complaint must give rise to a plausible inference that defendants' misrepresentations, as opposed to some other fact, foreseeably caused the loss for which plaintiffs' seek to recover. Mineworkers' Pension Scheme v. First Solar, Inc., 881 F.3d 750, 753-54 (9th Cir. 2018) (citing Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1210 (9th Cir. 2016)). Although pleading loss causation should not be burdensome, defendants are liable under Section 10(b) only for the "economic losses that their misrepresentations actually cause" and need not "provide investors with broad insurance against market losses." Dura Pharms., 544 U.S. at 345 and 347. Plaintiffs have the burden of showing that the misrepresentation was a substantial cause of the loss, but need not show that it was the sole reason for a drop in share price. Nuveen Mun. High Income Opportunity Fund v. City of Alameda., 730 F.3d 1111, 1119 (9th Cir. 2013).

Defendants argue that plaintiffs have failed to adequately plead loss causation because (a) there is no allegation that the "truth" about the locationing functionality was ever disclosed and (b) there are no allegations plausibly connecting the loss back to the facts about which defendants lied. Although plaintiffs allege that defendants misrepresented both the functionality of Impinj's primary product and the demand for that product, defendants ignore the demand

misrepresentation in making their loss causation argument. Plaintiffs have expressly alleged that the revelation of the truth - that demand was actually declining rather than increasing - adversely affected the share price. Nor is a revelatory moment required in order to allege loss causation. "Disclosure of the fraud is not a *sine qua non* of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." Mineworkers Pension, 881 F.3d at 753; Nuveen, 730 F.3d at 1120. While the revelation of fraud in the marketplace followed by a drop in share price is one theory of causation plaintiffs may allege, it is not the only one. Mineworkers' Pension, 881 F.3d at 754.

With regards to defendants' second argument, the Court finds the allegations adequate. Plaintiffs allege that defendants misrepresented the functionality of Impinj's primary product and that, as customers discovered the limitations of the platform, demand declined. There is nothing implausible about that chain of events. Plaintiffs further allege that the decline in demand resulted in a drop in revenues which, when finally revealed to the market, caused the share price to tumble and plaintiffs to suffer loss. The steps in the causal chain are all plausible and foreseeable. In this context, allegations that "the stock price fell upon the revelation of an earnings miss, even [though] the market was unaware at the time that fraud had concealed the miss," raise a plausible inference of causation. Id. Plaintiffs may ultimately be unable to prove their theory of causation, but it has been adequately alleged for purposes of this motion to dismiss.

**D. Control Person Liability**

Section 20(a) of the Securities Exchange Act of 1934 imposes secondary liability on persons who "control" persons or entities that have violated the securities laws:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall be liable jointly and severally with and to the same extent as such controlled person to any person to which some controlled person is liable, unless the controlling person

acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Defendants' only argument regarding Section 20(a) is that the claim should be summarily dismissed because plaintiffs have failed to sufficiently plead a primary violation under Section 10(b). Defendants' premise is, in large part, incorrect. In light of the Court's finding that plaintiffs may proceed with their Section 10(b) claims against Dorio and Fein, the derivative motion to dismiss the Section 20(a) claims against those defendants is DENIED. The parties have not substantively addressed, and the Court declines to decide, whether a valid Section 20(a) claim against Brodersen has been alleged.

## CONCLUSION

For all of the foregoing reasons, defendants' motion to dismiss plaintiffs' claims is GRANTED in part and DENIED in part. Plaintiffs' Section 10(b) and Rule 10b-5 claims against defendant Brodersen are dismissed, as are the claims related to statements regarding increasing demand prior to Q1 2017.

Because this matter continues as to all other claims, leave to amend will not be blindly granted. If plaintiffs believe they can, consistent with their Rule 11 obligations, amend the complaint to remedy the pleading deficiencies identified above, they may file a motion to amend and attach a proposed pleading for the Court's (and defendants') consideration.

Dated this 3rd day of October, 2019.

Robert S. Lasnik
United States District Judge

ORDER GRANTING IN PART
DEFENDANTS' MOTION TO DISMISS         -14-